Present:  All the Justices

PAUL WARNER POWELL

v.  Record No. 031421

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE LAWRENCE L. KOONTZ, JR.
January 16, 2004

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Herman A. Whisenant, Jr., Judge

In this appeal, we review the capital murder conviction and sentence of death imposed upon Paul Warner Powell for the murder of Stacey Lynn Reed in the commission of, or subsequent to, attempted rape.  Code § 18.2-31(5).

I. BACKGROUND

A. Powell's First Trial and Appeal

Powell was originally convicted of the capital murder of Stacey Lynn Reed in 2000 and sentenced to death.  See Powell v. Commonwealth, 261 Va. 512, 530, 552 S.E.2d 344, 354 (2001).  In the same trial, Powell was convicted of the abduction, rape, and attempted capital murder of Stacey's younger sister, Kristie Erin Reed, and was sentenced to three terms of life imprisonment and fines totaling $200,000 for those crimes.[1]  Id.

_____

[1] The abduction, rape, and attempted capital murder convictions, as well as a conviction for grand larceny, were affirmed in the prior appeal and are not at issue in this appeal.  Powell had also been tried for robbery and attempted robbery, Code § 18.2-58, and three counts of use of a firearm, Code § 18.2-53.1.  He was acquitted of those crimes.

Upon review of the capital murder conviction and the death sentence imposed upon Powell, this Court reversed the conviction on various grounds including a finding that the indictment charging Powell with capital murder in the commission of robbery and/or attempted robbery had been improperly amended to include a charge of capital murder "during the commission of or subsequent to rape and/or attempted rape and/or sodomy and/or attempted sodomy."[2]  Id. at 532, 552 S.E.2d at 355-56.  Upon review of the record, we further held that the wording of the indictment limited the Commonwealth to proving that the "gradation crime was a rape occurring before or during the killing," id. at 538-39, 535 S.E.2d at 359, and there was "no evidence upon which the jury could have found that Powell committed the rape of Kristie before or during the murder of Stacey."  Id. at 541, 535 S.E.2d at 361.

We summarized the consequence of these holdings in the conclusion of the opinion, stating:

> there is simply no evidence upon which the jury could have relied to find that Powell committed or attempted to commit any sexual assault against Stacey before or during her murder, or that the rape of Kristie did not

---

[2] Following the presentation of the Commonwealth's case-in-chief in Powell's first trial, the Commonwealth had conceded that there was no evidence of forcible sodomy or attempted forcible sodomy against Kristie.  Powell, 261 Va. at 525, 552 S.E.2d at 351.  Thus, that aspect of the amended indictment for capital murder from Powell's first trial is not relevant to any issue raised in this appeal.

2

occur after the murder of her sister.  Accordingly, under the circumstances of this case, the evidence at best would have supported a conviction for first degree murder.

For these reasons, we will reverse Powell's conviction for capital murder . . . and remand the case for a new trial on a charge of no greater than first degree murder for the killing of Stacey Reed, if the Commonwealth be so advised.

Id. at 545-46, 552 S.E.2d at 363.

The mandate from this Court to the trial court tracked the language of the opinion, and directed that "the case is remanded . . . for a new trial on a charge of no greater than first degree murder for the killing of Stacey Reed, if the Commonwealth be so advised."

## B. Events and Proceedings Following Remand

### Powell's Letter

On October 21, 2001, Powell wrote an obscenity-laced letter to the Commonwealth's Attorney who had prosecuted Powell in his first trial.[3]  Powell stated in the letter that, because he believed he could not be retried for capital murder, "I figured I would tell you the rest of what happened on Jan. 29, 1999, to show you how stupid all y'all . . . are."  Admitting that he "planned to kill the whole family" on that day, Powell further stated that "I had other plans for [Stacey] before she died."

3

Powell described how he had attempted to initiate consensual sexual intercourse with Stacey, which he had previously admitted. Powell then revealed that when Stacey resisted his advances, he pushed her onto her bed and, while sitting on top of her, told Stacey "that we could do it the easy way or the hard way."

Powell then described how Stacey had "started fighting with me and clawed me [sic] face." Powell stated that he "slammed her to the floor . . . sat on top of her and pinned her hands down again." Powell claimed that Stacey relented "and I told her if she tried fighting with me again I would kill her."

Continuing, Powell stated that, at his direction, Stacey began to disrobe, but stopped when the telephone rang. Stacey put her clothes back on so that she could answer the telephone. Powell refused to allow Stacey to answer the telephone and ordered her to resume disrobing. When she refused, Powell "pushed her back and pulled out [his] knife." When Stacey attempted to leave the bedroom, Powell stabbed her. Stacey fell back and Powell removed the knife. Stacey then stumbled to another bedroom and collapsed. Powell "saw that she was still

---

[3] Powell had previously written to the Commonwealth's Attorney on July 4, 2001, proposing a plea agreement for a first degree murder charge for the killing of Stacey Reed.

4

breathing" and "started stomping on her throat" until he "didn't see her breathing anymore."

### The New Indictment

Armed with this new evidence, the Commonwealth elected to nolle prosequi the indictment in the remanded case, under which it was limited to trying Powell for first degree murder under our mandate, and sought a new indictment against Powell for capital murder. On December 3, 2001, the grand jury returned an indictment charging Powell with the capital murder of "Stacey Lynn Reed during the commission of or subsequent to the attempted rape of Stacey Lynn Reed."

### C. Powell's Second Trial

### Motions to Dismiss the Indictment

On April 24, 2002, Powell filed a motion to dismiss the December 3, 2001 indictment. Powell asserted that "[w]hen the Supreme Court of Virginia issues an opinion concerning a case, this opinion becomes the law of the case" and, thus, the directive of the opinion and mandate from this Court in his first appeal limited his retrial to a charge no greater than first degree murder, regardless whether that trial was conducted under the original indictment or a new indictment. The Commonwealth filed a response to this motion, asserting that the judgment of this Court in Powell's first appeal was not applicable to the December 3, 2001 indictment because Powell had

"never [previously] been charged with the capital murder of Stacey Reed in the commission or attempted commission [of] sexual assault against [Stacey Reed] because, at the time of [Powell's first] trial, no such evidence existed."  Accordingly, the Commonwealth contended that the December 3, 2001 indictment was "a new charge, one that has never been litigated in trial nor considered by the Virginia Supreme Court."  Following a hearing on this and other pre-trial matters, the trial court overruled Powell's motion to dismiss the indictment in an order dated May 6, 2002.

On May 17, 2002, Powell filed a second motion to dismiss the December 3, 2001 indictment.  The briefs filed in the trial court in support of and in opposition to this motion parallel the arguments made on appeal with respect to this issue and, accordingly, we will only summarize the essential points of those arguments here.  The import of Powell's argument was that his prior trial and the reversal of his conviction by this Court acted as an "implied" or "judicial" acquittal of the attempted rape of Stacey, thus barring his retrial for her capital murder premised on that gradation offense.  The Commonwealth responded that the issue whether Stacey had been the victim of a sexual assault was not before the jury in his first trial because the bill of particulars provided at Powell's request indicated that only Kristie was the victim of the sexual assault gradation

6

offenses charged in the amended indictment.  Similarly, the Commonwealth contended that our comments concerning the insufficiency of the evidence to prove a sexual assault or attempted sexual assault against Stacey were not directed toward any finding of the jury, but to the contrary were indicative of the fact that the jury did not consider whether Stacey had been the victim of such an assault or attempt.

On June 5, 2002, the trial court held a hearing on Powell's second motion to dismiss the indictment.  After hearing argument, the trial court stated that by identifying Kristie as the victim of the rape or attempted rape in the bill of particulars, the Commonwealth had clearly identified her as the victim of those gradation crimes in the amended indictment for capital murder.  The trial court also agreed with the Commonwealth that this Court's reference to the lack of evidence to prove any sexual assault or attempted sexual assault against Stacey was merely a comment on the record, and not an assertion that this was a theory of the case presented by the Commonwealth in Powell's first trial.  On July 3, 2002, the trial court entered an order overruling Powell's second motion to dismiss the indictment.

Other Pre-trial Motions

On April 25, 2002, Powell filed a motion to have Virginia's statutory scheme for charging a capital crime and imposing a

7

death sentence declared unconstitutional on various grounds. On appeal, Powell reasserts only some of these arguments and does so only in summary fashion. Accordingly, we will not summarize those arguments in detail here, but will address them within the discussion of the relevant assignment of error, infra.

On April 26, 2002, Powell filed a motion seeking to have the Commonwealth's Attorney's office disqualified from prosecuting his case. Powell contended that the Commonwealth's Attorney had a conflict of interest because he was a key "chain of custody witness" with respect to his receipt of Powell's October 21, 2001 letter "confession" to the attempted rape of Stacey. Powell further contended that the offensive nature of that letter and his other conduct toward the Commonwealth's Attorney had created such a level of animosity that the Commonwealth's Attorney would not be able to objectively pursue justice, but would instead seek to satisfy a personal vendetta against Powell. Powell further contended that this taint of bias extended to every attorney in the Commonwealth's Attorney's office, and further asserted that these attorneys would be potential witnesses called to give testimony concerning the Commonwealth's Attorney's personal animus against Powell.[4]

---

[4] Powell further contended that one of the Assistant Commonwealth's Attorneys while in private practice had represented Powell in an unrelated criminal matter and, thus,

8

On May 1, 2002, the Commonwealth filed responses to Powell's motions to have Virginia's statutory scheme for charging a capital crime and imposing a death sentence declared unconstitutional and to disqualify the Commonwealth's Attorney's office. With respect to the former, the Commonwealth asserted that all the issues raised therein had previously been considered and rejected by this Court, and there was no cause for the trial court to revisit them. As to the latter, the Commonwealth asserted that there was no evidence of bias on the part of the Commonwealth's Attorney or other members of his office and denied that there was any such bias, that the manner of establishing the chain of custody of Powell's letter was not the defense's concern, and that the questions of an appearance of impropriety should be raised through a disciplinary complaint proceeding.

On May 6, 2002, in the same hearing in which the trial court heard argument of Powell's first motion to dismiss the indictment, the trial court also heard argument on Powell's motions to have Virginia's statutory scheme for charging a capital crime and imposing a death sentence declared unconstitutional and to disqualify the Commonwealth's Attorney's

---

had a conflict of interest. Powell does not reassert this issue on appeal.

office from prosecuting the case.  Following that hearing, the trial court entered an order overruling these motions without comment.

On December 11, 2002, Powell filed a motion to exclude any evidence concerning his abduction, rape, and attempted murder of Kristie Reed from his trial.  Powell contended that because he was charged only with the capital murder of Stacey Reed predicated on an attempted rape of her, evidence of his subsequent attack on Kristie was irrelevant or that any probative value it might have would be overborne by its unduly prejudicial effect on the jury.  The Commonwealth did not file a response to this motion, but during oral argument in a hearing held December 23, 2002, the Commonwealth asserted that evidence concerning the attack on Kristie was part of a continuing criminal enterprise and was relevant to show Powell's motive and intent in attempting the rape of Stacey.

Also on December 11, 2002, Powell, alleging that the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002) had called into question prior judgments of this Court concerning the issue, filed a motion seeking to have Code § 19.2-264.4(B) declared unconstitutional because it permits a jury to consider evidence relating to the future dangerousness and vileness aggravating factors without full protection of due process to the defendant to confront witnesses.  Powell also

10

asserted that the statutory definitions of the aggravating factors are vague and, thus, would likely result in "unreliable" jury verdicts. The Commonwealth filed a brief in response to this motion, asserting that the issue of the constitutionality of Code § 19.2-264.4(B) is settled law.

On December 16, 2002, Powell filed a motion to suppress various statements he made to police during the initial investigation of the crimes. Powell alleged that after giving an initial statement following waiver of his Miranda rights, he advised police that he had nothing more to say. Thereafter, Powell contended, any statement he made to police without a readvisement and waiver of his Miranda rights should be suppressed. The Commonwealth responded that the suppression issue had been decided in Powell's first trial and, thus, the doctrine of res judicata barred consideration of the issue in his second trial.[5] Powell filed a supplemental motion on December 17, 2002 asserting that a statement taken by an investigator on November 2, 2001, while Powell was in prison following his first trial, should be suppressed because his counsel was not present. The Commonwealth responded that Powell had been advised of and waived his Miranda rights prior to

---

[5] Powell did not contest the trial court's failure to suppress his statements in the appeal of his first conviction.

11

giving this statement and that he was not entitled to counsel under the Sixth Amendment at that time because he had not yet been indicted for the offense for which he was then on trial, and the formal proceedings on the prior indictments had concluded.

In summarizing its rulings on these motions during the December 23, 2002 hearing, the trial court stated that it found Powell had waived his Miranda rights with respect to the statement made after his first trial but prior to the bringing of the second indictment and, thus, the statement was not barred by either the Fifth or Sixth Amendments. The trial court also indicated that it would deny the motion to suppress the statements from the initial investigation of the crimes, incorporating by reference the finding made during the first trial with respect to those statements. The trial court further found that evidence of Powell's attack on Kristie was admissible as being part of a common scheme and to show consciousness of guilt. The trial court entered an omnibus order denying all these motions as well as the motion challenging the constitutionality of Code § 19.2-264.4(B).

### Jury Voir Dire

Powell's second trial commenced on January 13, 2003. The trial court conducted voir dire of the venire in panels of five potential jurors. In questioning the first panel, the trial

12

court inquired whether "any of you have acquired any information about the alleged offense, or of the accused from the news media, or other sources in this particular matter?" The five panel members indicated that they had not. The Commonwealth further inquired whether "[i]f during the course of trial you should hear something which would jog your memory about the publicity, would you be able to set that aside and render your verdict based solely on what you hear in the courtroom?" The five panel members each indicated that they could do so.

During his voir dire of the first panel, Powell's counsel attempted to ask the following question:

> You're going to hear in this case that the Defendant has already been tried and convicted of capital murder at one point, and he's serving life sentences for other crimes. You're also going to hear that the Supreme Court of Virginia overturned the –

At this point, the Commonwealth objected and during a bench conference, referencing Barker v. Commonwealth, 230 Va. 370, 375, 337 S.E.2d 729, 733 (1985), asserted that, as the panel had already indicated that they had not heard of the case previously, Powell's counsel's question concerning the prior trial and appeal "may, in fact, taint" the members of the panel and disqualify them from serving on the jury. Powell's counsel responded that because the evidence would disclose the fact of his prior convictions and the reversal of his capital murder conviction and death sentence on appeal, the prohibition of

13

Barker did not apply.  He further contended that because a jury's knowledge of a prior conviction was potentially prejudicial to the defendant, it was a "tactical decision that we've made . . . and we wish this evidence to come forward."  Thus, he contended that it was proper to explore the potential jurors' bias that would result from hearing that evidence.

The trial court ruled, even though it agreed that this was a "unique case" because the evidence would establish the fact of the prior conviction and appellate reversal, "the Barker case is still good law."  Accordingly, the trial court concluded that "we have to start off with a jury that does not have" knowledge of the prior trial, conviction, and appeal.  Accordingly, the trial court ruled that Powell could not question the jurors about their potential bias based upon such evidence being likely to be presented during the trial.

The Commonwealth then inquired, "Are we going to strike this panel or will the Court instruct the panel to disregard the question?"  When the trial court indicated that it would instruct the panel to disregard the question, Powell's counsel objected that he was "not sure that instructing them is sufficient . . . if they've already been told —."  The trial court cut off the objection, stating that the members of the panel had already indicated they were unaware of the case and that "all I can do is tell them to disregard the question."

14

## Guilt-Determination Phase

Apart from the new evidence of Powell's October 21, 2001 letter to the Commonwealth's Attorney in which Powell confessed to the attempted rape of Stacey, the evidence presented during the guilt-determination phase of Powell's second trial was not markedly different from that received during the first trial. Because we have thoroughly recounted that evidence in reviewing his first trial, see Powell, 261 Va. at 518-520, 552 S.E.2d at 347-348, and Powell does not challenge the sufficiency of the evidence except with respect to proof of the attempted rape of Stacey, we need not reiterate the full extent of the evidence, but will suffice with a summary of the essential details.

Powell, who was twenty years old at the time of the crimes, had been acquainted with Stacey and her family for approximately two-and-a-half years. Powell, a self-avowed racist and white supremacist, objected to Stacey dating Sean Wilkerson, a black classmate of Stacey's. Id. at 518, 552 S.E.2d at 347.

Stacey arrived home just before noon on January 29, 1999 to find Powell waiting for her. When Powell learned that Robert Culver, a friend of the girls' mother, would be home shortly for lunch, Powell left, but returned at about 12:45 p.m., after Culver had left. When Powell returned, he was armed with a survival knife, a butterfly knife, a box cutter, and a 9-millimeter pistol. Id.

15

During the initial investigation, Powell claimed that he and Stacey had argued about her relationship with Wilkerson and in an ensuing struggle, Powell drew the survival knife from his belt and Stacey "got stuck." Id. Although Powell denied stabbing Stacey deliberately or otherwise injuring her, an autopsy revealed that she had suffered multiple blunt force injuries to her head, neck, and upper body not consistent with her merely having fallen during a struggle, but consistent with a deliberate stomping. The autopsy also showed that the wound to Stacey's chest was consistent with the knife having been twisted and partially withdrawn and reinserted. Id. at 520, 552 S.E.2d at 348.

Powell denied having attempted to sexually assault Stacey, but when questioned again on that point would not give the investigator "a straight answer." Powell later told police that he "probably" raped Kristie because he "didn't get any with Stacey."

Leaving Stacey for dead, Powell smoked a cigarette and drank a glass of iced tea in the living room of the home, waiting for Kristie to return home from school. When she arrived, Powell met her at the door. Shortly thereafter, Kristie discovered her sister's body. Powell then forced her to go to the basement of the home where he brutally raped her and

16

attempted to kill her by strangulation and by cutting her wrists and throat.  Id. at 519, 552 S.E.2d at 347.

At the conclusion of the Commonwealth's case-in-chief, Powell moved to strike the evidence on the ground that the Commonwealth had not presented sufficient evidence to corroborate Powell's confession in the October 21, 2001 letter that he had attempted to rape Stacey.  The Commonwealth pointed to the physical circumstances, such as the disheveled condition of Stacey's bedroom, Stacey's defensive wounds, and the fact that when her body was discovered her pants' zipper was slightly undone, as corroborating Powell's confession.  The trial court denied the motion to strike.  Thereafter, Powell elected not to offer any evidence.

The jury was instructed, heard closing arguments, and retired to consider its verdict.  After two hours of deliberation, the jury found Powell guilty of capital murder. Powell requested a poll of the jury, which confirmed that the verdict was unanimous.

### Penalty Determination Phase

During the penalty determination phase, the Commonwealth presented evidence of Powell's criminal record, including three convictions for contributing to the delinquency of a minor, two larceny convictions, and his convictions for the abduction, rape, and attempted capital murder of Kristie.  The Commonwealth

17

further presented evidence concerning Powell's extreme racist views.  Additional evidence showed that Powell had tortured cats when he was younger and that he told an investigator that he wanted to purchase a gun to "[k]ill somebody.  Kill a lot of somebodies. . . .  Just for something to do."  Powell also told the investigator that he admired Charles Manson and Adolf Hitler, saying that "[t]hey were cool."  The Commonwealth also presented evidence that Powell wrote an abusive letter to Stacey's mother in which he included a pornographic picture of a woman who resembled Stacey.

Powell presented evidence from his parents and younger brother, a social worker, a psychologist, and a probation officer.  This evidence dealt primarily with Powell's upbringing and transfer of custody from his mother to the Department of Youth and Family Services following his juvenile offenses.  The psychologist described Powell's home environment as "toxic." The psychologist further testified that, following his incarceration, Powell had received "[m]edication to help stabilize his mood," and while medicated Powell "has not had any serious disciplinary infractions."  The psychologist did not offer a specific diagnosis for Powell's "mental-health problems," but testified that Powell's clinical history suggested an "anti-social personality disorder" and that his behavior as a child suggested Powell had "an under controlled

temperament." The psychologist further testified that the medication Powell had received in the past was "used for manic depressive illness which is now called bi-polar disorder and for certain forms of serious depression."

After ninety minutes of deliberation, the jury returned a unanimous verdict sentencing Powell to death. The jury indicated that the sentence was predicated on both the future dangerousness and vileness aggravating factors.

## Sentencing

On May 8, 2003, the trial court held a sentencing hearing and received a pre-sentence report and victim impact evidence from Stacey's mother. Powell's counsel argued that imposition of the death sentence was not appropriate, asserting that so long as Powell were confined and properly medicated, he did not present a continuing danger to society and that a life sentence without possibility of parole was adequate punishment. The Commonwealth responded that Powell had shown no remorse following his conviction in the first trial. The trial court then confirmed the jury's sentence of death. We consolidated the automatic review of Powell's death sentence with his appeal of the capital murder conviction and expedited the appeal on our docket. Code § 17.1-313(F).

II. DISCUSSION

Powell raises twelve assignments of error, the first two of which merely restate the elements of the statutory review of any death sentence mandated by Code § 17.1-313(C). We will review Powell's arguments in the order in which the trial court considered the issues below.

## A. Failure to Dismiss the Capital Murder Indictment

In his sixth and seventh assignments of error, Powell contends that the trial court erred in denying his motions to dismiss the capital murder indictment against him. This was the principal issue addressed by the parties during oral argument before this Court. The various positions under which Powell asserts that he was not subject to trial under the capital murder indictment can be generally summarized as follows:

(1) The opinion and mandate of this Court from Powell's first trial limited his retrial for the killing of Stacey Reed to a charge no greater than first degree murder on any indictment.

(2) Even if retrial on a charge of capital murder was not barred under a new indictment, Powell had been acquitted, either actually or by implication, of the attempted rape of Stacey Reed in his first trial and, thus, the law of the case doctrine barred his being tried for capital murder based upon the attempted rape of Stacey as the gradation offense.

(3) Principles of double jeopardy bar his retrial for a violation of Code § 18.2-31(5) because the indictment in his first trial did not specify the victim of the gradation offense.

## Effect of Prior Opinion and Mandate

We recognize the principle of the "mandate rule," stated by the Court of Appeals of Virginia in a different context, that:

> A trial judge is bound by a decision and mandate from [an appellate court], unless [the court] acted outside [its] jurisdiction. A trial court has no discretion to disregard [a] lawful mandate. When a case is remanded to a trial court from an appellate court, the refusal of the trial court to follow the appellate court mandate constitutes reversible error.

Rowe v. Rowe, 33 Va. App. 250, 257-258, 532 S.E.2d 908, 912 (2000); see also Frank Shop, Inc. v. Crown Central Petroleum Corp., 264 Va. 1, 6, 564 S.E.2d 134, 137 (2002) (holding that "a trial court cannot permit what this Court . . . [has] said is unlawful" in a mandate reversing the trial court's prior judgment and remanding the case).

Relying on this principle, Powell contends that the trial court was without authority to retry him on a new indictment charging him with the capital murder of Stacey Reed. Powell's reliance, however, is misplaced.

It is self-evident that while the opinion of an appellate court, under the doctrine of stare decisis, applies to all future cases in the trial courts, the mandate, which is the directive of the appellate court certifying a judgment in a particular case to the court from which it was appealed, speaks only to that case. Moreover, the mandate is controlling only "as to matters within its compass." Sprague v. Ticonic National

Bank, 307 U.S. 161, 168 (1939).  Thus, while the directive of this Court's mandate binds the circuit court, that court is not thereby prohibited from acting on matters not constrained by the language of the mandate, construed in light of the appellate court's opinion.  The mandate rule "is merely a 'specific application of the law of the case doctrine,' [and] in the absence of exceptional circumstances, it compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court."  United States v. Bell, 5 F.3d 64, 66 (4th Cir. 1993) (quoting United States v. Bell, 988 F.2d 247, 251 (1st Cir. 1993)).

Undoubtedly, had the trial court permitted the Commonwealth to retry Powell for capital murder on the original amended indictment invalidated by our decision in reviewing his first conviction, this would have been violative of our mandate and reversible error.  Similarly, had the Commonwealth dismissed that indictment and sought a new indictment charging Powell with the capital murder of Stacey Reed prior to the rape of Kristie Reed, it would have been error for the trial court to permit that indictment to stand.

However, nothing in our opinion or mandate from Powell's first appeal required the Commonwealth to retry Powell on the original indictment, abridged to cure the defects found by this

22

Court to charge only first-degree murder.  To the contrary, the directive of the mandate expressly stated that Powell was to be retried on that indictment based on the record that was before this Court at that time, only "if the Commonwealth be so advised."

Nor did our opinion or mandate expressly preclude the possibility of trying Powell on a new indictment charging capital murder premised on a different gradation offense after dismissal of the former, defective indictment.  Powell's October 21, 2001 letter to the Commonwealth's Attorney in which he revealed that he had attempted to rape Stacey before he killed her is an exceptional circumstance that merits a narrow application of the mandate rule.

We recognize that, generally, serial prosecutions are not permitted where the Commonwealth deliberately refrains from bringing criminal charges arising out of the same act or transaction while prosecuting others in order to gain the advantage of having multiple trials.  See, e.g., Ashe v. Swenson, 397 U.S. 436, 444 (1970).  Such was not the case here, however, given the unexpected and possibly unique circumstance of evidence of an uncharged offense that was not previously known or available coming to light after the conclusion of the first trial in the form of the defendant's voluntary confession.

23

Accordingly, we hold that the trial court correctly ruled that the opinion and mandate of this Court from Powell's prior appeal did not bar the Commonwealth from dismissing the indictment against him and bringing a new indictment charging him with capital murder premised upon a gradation offense not previously charged by the Commonwealth and based upon evidence that was not previously known or available to the Commonwealth at the time of his first trial.

### Acquittal under the "Law of the Case"

Powell contends that although he was not charged in a separate indictment with the attempted rape of Stacey in his first trial, the Commonwealth nonetheless presented evidence tending to show that he attempted to rape Stacey to bolster its claim that her murder was related to a sexual assault. To support this claim, Powell relies upon statements made by the Commonwealth's Attorney during his first trial that the evidence would show that Powell "wanted something more from [Stacey] and she wasn't going to give it to him and for that she lost her life." Powell further notes that during his first trial the Commonwealth had argued against his motion to strike the evidence on capital murder by stating, in part, that "we have evidence . . . [that Powell] was having sex or attempting to have sex with [Stacey]."

Powell contends that as neither the amended indictment for capital murder nor the instructions given to the jury specified the victim of the sexual assault gradation crimes, the Commonwealth intended for the jury in his first trial to consider the possibility that Powell attempted to rape Stacey. Powell notes that because the jury in his first trial sent a question to the trial court "seeking clarification whether the rape of Kristie could satisfy the gradation crime requirement for the capital murder of Stacey," Powell, 261 Va. at 526, 552 S.E.2d at 352, this indicated that the jury had considered and rejected the theory that he had attempted to rape Stacey. Relying on Green v. United States, 355 U.S. 184, 189-90 (1957), Powell asserts that because the jury in his first trial rejected that theory of the crime, it impliedly acquitted him of the gradation offense and, thus, he contends that the law of the case prohibits the Commonwealth from retrying that issue under a new indictment.[6] Powell further points to statements in the opinion from his first appeal concerning the insufficiency of the evidence to prove an attempted sexual assault of Stacey as

_____

[6] On brief, Powell also used the term "res judicata" in describing the effect of his alleged "acquittal" of the attempted rape of Stacey. During oral argument of this appeal, he conceded that he was relying only on the "law of the case" doctrine in asserting the preclusive effect of his prior trial and appeal.

25

confirming that he was charged with capital murder based on that gradation offense.

The Commonwealth contends that by identifying Kristie as the victim of the rape or attempted rape in responding to Powell's motion for a bill of particulars, it had clearly indicated that Powell was not charged or on trial for the capital murder of Stacey in the commission of the attempted rape of Stacey. Therefore, the Commonwealth asserts that Powell was never placed in jeopardy for the commission of that crime and, thus, cannot have been "acquitted" of that crime or of its gradation offense.

Powell contends that "the bill of particulars is irrelevant to the issue of whether the [Supreme] Court previously decided that Powell was charged with capital murder in the commission of the attempted rape of Stacey Reed in his first trial." Powell bases this contention on the statements in the opinion reversing his first conviction for capital murder that "[t]he record as a whole is devoid of any evidence that Powell attempted to rape . . . Stacey," Powell, 261 Va. at 534, 552 S.E.2d at 357, and that "there is simply no evidence upon which the jury could have relied to find that Powell committed or attempted to commit any sexual assault against Stacey," id. at 545, 552 S.E.2d at 363. Powell contends that by these statements we indicated that the

26

question whether he had raped or attempted to rape Stacey had been at issue in his first trial.  We disagree.

The question, simply put, is whether the jury in Powell's first trial considered whether Powell attempted to rape Stacey Reed and concluded that he did not.  Our guide in resolving that question is Ashe, supra, wherein the United States Supreme Court held that an issue will be precluded from being retried in a subsequent criminal prosecution by the law of the case doctrine if, in light of the entire record, the previous jury necessarily decided that issue against the prosecution.  But if "a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration," the prior judgment will not be taken as deciding that particular issue.  Ashe, 397 U.S. at 444.  "The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' "  Id. (quoting Sealfon v. United States, 332 U.S. 575, 579 (1948)).

Powell's view of the record of his first trial, and of this Court's observation that the evidence therein was insufficient for the jury to have found that he attempted to rape Stacey, as showing that the previous jury necessarily decided that issue against the prosecution fails to take into account the effect of the bill of particulars.  "It is true the bill of particulars is not for the purpose of charging the offense.  The indictment

27

must do that."  Livingston v. Commonwealth, 184 Va. 830, 837, 36 S.E.2d 561, 565 (1946).  "However, the bill of particulars and the indictment must be read together.  The function of the bill of particulars is to supply additional information concerning an accusation."  Id.  A bill of particulars not only informs the accused of the charges against him with sufficient precision to enable him to prepare his defense and avoid surprise, it also enables him to plead his acquittal or conviction in bar of any further prosecution for the same offense.  See Wade v. Commonwealth, 9 Va. App. 359, 363, 388 S.E.2d 277, 279 (1990); see also United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988).

The bill of particulars in Powell's first trial clearly limited the prosecution of the capital murder of Stacey under Code § 18.2-31(5) to proof of the rape or attempted rape of Kristie.  Nevertheless, Powell asserts that the various statements of the Commonwealth during his first trial with respect to Powell's effort to initiate consensual intercourse with Stacey, and his frustration at being rebuffed by her, suggested a motive for his subsequent attack on her sister and attempted to influence the jury into believing that Stacey was also the victim of an attempted sexual assault.  The fact remains that Powell was not charged with having attempted to rape Stacey, either as a separate offense or as the gradation

28

offense of the capital murder charge.  Thus, it is not possible to conclude that the jury necessarily decided that issue against the prosecution.

Powell is also mistaken in his interpretation of our statements regarding his first trial that the record contained insufficient evidence for the jury to have found that Powell attempted to rape Stacey.  A careful reading of our opinion shows that these statements were not intended to convey that this issue was before the jury.  To the contrary, these statements were observations made to clarify that the amended indictment must have been intended to charge Powell with the capital murder of Stacey premised upon the gradation offense of the rape of Kristie, but was insufficient to do so because of a drafting error.[7]

Powell also contends that even if the jury had not impliedly acquitted him of the capital murder of Stacey premised on the gradation offense of her rape or attempted rape, the effect of this Court's decision in the appeal of his first conviction nonetheless was to expressly acquit him of that crime because we found the evidence in that trial insufficient to

---

[7] We also held that the amendment of the indictment, even if properly drafted, would not have been permitted because the grand jury "was never called upon to consider [the rape of Kristie] as the gradation crime for the capital murder of Stacey."  Powell, 261 Va. at 534, 552 S.E.2d at 357.

29

support a finding of rape or attempted rape of Stacey.  Relying on Burks v. United States, 437 U.S. 1, 5-6 (1978), Powell asserts that, because we held that the evidence at his first trial at best would have supported a conviction for first degree murder, the trial court was bound by that determination in any subsequent retrial.  Powell contends that Burks stands for the proposition that the determination of an appellate court that the trial court erred in permitting the jury to consider a charge not supported by the evidence acts as an acquittal on that charge and that a retrial for the same offense is barred by the prohibition against double jeopardy.

Our conclusion that, lacking evidence of a sexual assault on Stacey or the attempt to commit one, Powell could be retried only for first degree murder was based upon "the circumstances of this case."  Powell, 261 Va. at 545-46, 552 S.E.2d at 363.  Nothing in that statement implies that Powell had been acquitted of capital murder premised on any possible gradation offense, nor, as we have already demonstrated, did it preclude the Commonwealth from seeking to indict Powell for the capital murder of Stacey with the attempted rape of Stacey as the gradation offense under the exceptional circumstances occasioned by Powell's voluntary confession.

Accordingly, we hold that the trial court did not err in denying Powell's motions to dismiss the indictment for capital

30

murder on the ground that the Commonwealth was prohibited from proving Powell attempted to rape Stacey by the law of the case of his former trial and appeal.

## Double Jeopardy

Powell also contends that the trial court should have dismissed the indictment against him because his prosecution under that indictment violated the guarantee of the Fifth Amendment of the Constitution of the United States against being twice placed in jeopardy for the same offense. Specifically, he asserts that having been indicted once for a violation of Code § 18.2-31(5) for the murder of Stacey Reed, his constitutional guarantee of protection against being placed in double jeopardy prohibited the Commonwealth from indicting him a second time for that murder under the same subsection of the capital murder statute.

During oral argument of this appeal, Powell acknowledged that the Commonwealth may indict and convict an accused for multiple counts of capital murder of a single victim under different subsections of Code § 18.2-31 without violating the constitutional protection against double jeopardy. See Bailey v. Commonwealth, 259 Va. 723, 747, 529 S.E.2d 570, 584, cert. denied, 531 U.S. 995 (2000) (a single indictment may charge two counts of capital murder of the same victim under Code §§ 18.2-31(7) and 18.2-31(12)). Moreover, we have held that

31

where a particular subsection of Code § 18.2-31 lists multiple gradation offenses, the Commonwealth may indict the accused for separate offenses of capital murder of a single victim premised on each specific gradation offense.  Payne v. Commonwealth, 257 Va. 216, 228, 509 S.E.2d 293, 301 (1999) (indictments properly charged separate violations of Code § 18.2-31(5) premised on rape and object sexual penetration of the same victim).  In Payne, we said that "it is clear, as well as logical, that the General Assembly intended for each statutory offense [in Code § 18.2-31] to be punished separately 'as a Class 1 felony.' " Id.

By statutory definition, capital murder is limited to the "willful, deliberate, and premeditated killing of any person" under specific circumstances or in the commission or attempted commission of certain crimes enumerated in Code § 18.2-31.  We have frequently referred to these crimes as gradation offenses because, when committed as part of the same transaction as a murder, they elevate what would otherwise constitute murder of the first degree pursuant to Code § 18.2-32 to capital murder. Pertinent to the present case, Code § 18.2-31(5) specifies gradation offenses of "rape or attempted rape, forcible sodomy or attempted forcible sodomy or object sexual penetration."  In Payne, we concluded that the rape and object sexual penetration of the same victim are separate and distinct gradation offenses

32

and, therefore, support two capital murder convictions consistent with double jeopardy protections.  Id.  While Payne is instructive insofar as it establishes that separate and distinct gradation offenses are enumerated in Code § 18.2-31(5), it does not resolve Powell's case.

Powell's contention that he was charged with the same crime rather than with two separate crimes under the amended indictment and the 2001 indictment is principally premised upon the fact that the former failed to identify the victim of the rape or attempted rape.  Because the amended indictment in his first trial, while identifying Stacey as the victim of the murder, did not specify a victim of the gradation offenses of rape or attempted rape, Powell contends that proof of the identity of the victim was not an element of those offenses. Thus, he argues that he was placed in jeopardy regardless of whether Stacey or Kristie were proven to be the victim of the gradation offenses of rape or attempted rape, and the subsequent indictment that expressly identified Stacey as the victim of attempted rape violated his constitutional guarantee against double jeopardy.

We agree with Powell that when an indictment does not specify the identity of the victim of a gradation offense to the crime of capital murder, the identity of the victim of the gradation offense is not an element of the crime.  Powell,

33

however, has again overlooked the significance of the bill of particulars provided by the Commonwealth in his first trial. As we have already explained, the Commonwealth expressly identified Kristie as the victim of the gradation offenses for the capital murder of Stacey under Code § 18.2-31(5). The bill of particulars was filed well in advance of the trial and before jeopardy had attached. See Commonwealth v. Washington, 263 Va. 298, 307, 559 S.E.2d 636, 641 (2002) ("The right not to be subjected to double jeopardy attaches in a criminal case when the jury is impaneled and sworn").

During oral argument of this appeal, Powell contended that the bill of particulars only limits the Commonwealth's ability to argue a specific theory of the crime, does not amend the indictment, and jeopardy attaches as to the indictment as worded regardless of whether a bill of particulars has been filed. We disagree.

As noted above, while "[i]t is true the bill of particulars is not for the purpose of charging the offense . . . the bill of particulars and the indictment must be read together." Livingston, 184 Va. at 837, 36 S.E.2d at 565. Thus, we hold that where, prior to the attachment of jeopardy, the Commonwealth limits the prosecution of a capital murder, undifferentiated in the indictment by the identity of the victim of the gradation offense, by naming a specific victim of the

34

gradation offense in a bill of particulars, jeopardy will attach only to the capital murder charge as made specific by the bill of particulars.

For these reasons, we further hold that the trial court did not err in refusing to dismiss the indictment for capital murder as violative of Powell's double jeopardy protection.

B. Constitutionality of Virginia's Capital Murder Statutes

In his third and eleventh assignments of error, Powell attacks the trial court's order overruling his motions to have the Virginia capital murder statutes declared unconstitutional. With respect to the motion filed April 25, 2002 and overruled by the trial court on May 6, 2002, Powell has restated, in summary fashion, five of his arguments advanced in the trial court, without citation to authority.[8] The failure to adequately brief an assignment of error constitutes a waiver of the argument. See, e.g., Burns v. Commonwealth, 261 Va. 307, 318, 541 S.E.2d 872, 880, cert. denied, 534 U.S. 1043 (2001) (assignments of

---

[8] At trial, Powell further contended that the expedited review of death sentence cases required by Code § 17.1-313 violated a defendant's constitutional right to equal protection. Powell contended that by eliminating an intermediate review by the Court of Appeals, a defendant is denied the opportunity to perfect the issues and arguments he wishes to make on appeal. He further contended that expediting death sentence appeals on our docket "disadvantaged death-sentence defendants by providing them with substantially less time than other criminal defendants to protect their legal rights." Powell does not reassert these issues on appeal.

error not briefed are waived even where trial record contains written argument addressing same issue).

Moreover, the arguments raised by Powell have been previously considered and rejected by this Court. The arguments raised by Powell and recent decisions rejecting those arguments are:

That the statutes fail to provide meaningful guidance with respect to the vileness and future dangerousness aggravating factors and that the jury is not provided adequate guidance with respect to the application of aggravating and mitigating factors. Rejected in Morrisette v. Commonwealth, 264 Va. 386, 397, 569 S.E.2d 47, 55 (2002), cert. denied, ___ U.S. ___, ___ S.Ct. ___, 72 U.S.L.W. 3392 (2003).

That permitting evidence of unadjudicated criminal conduct to be used to establish the defendant's future dangerousness fails to meet the "heightened reliability requirement" of the 8th and 14th Amendments. Rejected in Bell v. Commonwealth, 264 Va. 172, 203, 563 S.E.2d 695, 716 (2002), cert. denied, 537 U.S. 1123 (2003).

That the trial court is improperly vested with discretion whether to set aside the death sentence for good cause shown and is permitted to consider hearsay evidence in the pre-sentence report. Rejected in Lenz v. Commonwealth, 261 Va. 451, 459, 544 S.E.2d 299, 303-04, cert. denied, 534 U.S. 1003 (2001).

36

That the mandatory proportionality review procedures employed by this Court fail to meet constitutional standards. Rejected in Lovitt v. Commonwealth, 260 Va. 497, 509, 537 S.E.2d 866, 874 (2000), cert. denied, 534 U.S. 815 (2001); Bailey, 259 Va. at 740-42, 529 S.E.2d at 580-81, cert. denied, 531 U.S. 995 (2000).

With respect to the December 11, 2002 motion, overruled by the trial court on December 23, 2002, Powell asserts, as he did in the trial court, that the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002), requires that "many of the procedural safeguards that heretofore have only been required during the guilt/innocence phase of trial must now be extended to the sentencing phase." Powell reasons that because Ring held that it was impermissible in a jury trial to allow the trial judge to determine whether there were aggravating factors sufficient to warrant the imposition of the death penalty, id. at 609, the aggravating factors required to be found by Code § 19.2-264.4(B) before a sentence of death may be imposed are "to be treated as elements of the offense of a death-eligible capital murder." Powell contends that the standards of proof and rules of evidence applicable to the determination of guilt must also be applied to the determination of sentence, and that, contrary to decisions of this Court made prior to Ring, this precludes the Commonwealth from presenting

37

under a "relaxed evidentiary standard" evidence of unadjudicated criminal conduct or hearsay evidence when the declarant is not available for cross-examination as required by the confrontation clause.

The Commonwealth responds that Ring does not alter the analysis of the constitutionality of the procedures applied during the penalty determination phase of a capital murder trial in Virginia. Rather, the Commonwealth contends that the procedures for the admission of relevant evidence during the penalty determination phase under Code § 19.2-264.4(B) continue to be fully in accord with the Sixth Amendment due process concerns underpinning the decision in Ring. We agree with the Commonwealth.

First, we note that Powell's expansive reading of Ring is unwarranted for the obvious reason that the statutory scheme at issue in that case, which permitted the judge in a capital murder jury trial to assume the role of the jury in determining whether aggravating factors permitting the imposition of the death penalty were present, is markedly different from that of Virginia's death penalty sentencing statute. See Ring, 536 U.S. at 588. Moreover, nothing in the United States Supreme Court's opinion in Ring suggests that the Court intended to revisit broader issues of due process protections afforded in the penalty determination phase of all capital murder trials.

We further reject Powell's contention that there is a "relaxed evidentiary standard" applicable to the penalty determination phase of a capital murder trial in Virginia. To the contrary, Code § 19.2-264.4(B) expressly provides, and we have consistently held, that the Commonwealth must prove the existence of one or both aggravating factors beyond a reasonable doubt. See, e.g., Clark v. Commonwealth, 220 Va. 201, 212, 257 S.E.2d 784, 791 (1979), cert. denied, 444 U.S. 1049 (1980). Powell's contention that the introduction of evidence of unadjudicated criminal acts is not admissible because Ring somehow refines the need for "heightened reliability" in capital sentencing is, as the Commonwealth notes, nothing more than a reassertion of the same argument raised in his prior motion and consistently rejected by this Court. Jackson, Jerry v. Commonwealth, 267 Va. 178, 189, ___ S.E.2d ___, ___ (2004) (today decided). Powell's assertion that Code § 19.2-264.4(B) permits the introduction of hearsay evidence not otherwise subject to an exception is simply wrong.[9] See, e.g., Lovitt v.

---

[9] On brief, the Commonwealth suggests that Powell has confused the evidentiary standard applicable to the penalty determination phase with that applicable to the trial court's consideration of the presentence report. Powell did not respond to this assertion in his reply brief and does not otherwise assert that Ring has any implication to the post-verdict sentencing procedure. Accordingly, we express no opinion on that issue.

<u>Warden</u>, 266 Va. 216, 259, 585 S.E.2d 801, 826 (2003); <u>Jackson</u>, 267 Va. at ___, ___ S.E.2d at ___.  For these reasons, we hold that the trial court did not err in overruling Powell's motion to have the Virginia capital murder statutes declared unconstitutional.

### C. Failure to Disqualify the Commonwealth's Attorney

In his tenth assignment of error, Powell contends that the trial court erred in failing to grant his motion to disqualify the Commonwealth's Attorney and his office from prosecuting Powell on the new indictment.  Powell asserts the "grossly offensive personal attacks" on the Commonwealth's Attorney in Powell's October 21, 2001 letter, created a direct conflict of interest because the Commonwealth's Attorney "had a personal stake in the outcome of this case."  This is so, Powell contends, because the personal attacks in his letter "undoubtedly led [the Commonwealth's Attorney] to have feelings of animosity towards Powell."  The Commonwealth responds that the Commonwealth's Attorney represented to the trial court that he could impartially prosecute the case and that it was a matter within the trial court's discretion to determine whether to disqualify him.  We agree with the Commonwealth.

The due process rights of a criminal defendant under both the Virginia and United States Constitutions are violated when a Commonwealth's Attorney who has a conflict of interest relevant

40

to the defendant's case prosecutes the defendant.  See Cantrell v. Commonwealth, 229 Va. 387, 394, 329 S.E.2d 22, 26-27 (1985); Ganger v. Peyton, 379 F.2d 709, 714 (4th Cir. 1967).  However, the question whether there is a conflict of interest is dependent upon the circumstances of the individual case, and the burden is on the party seeking disqualification of the prosecutor to present evidence establishing the existence of disqualifying bias or prejudice.  The determination whether the evidence supports a finding of a conflict of interest is a matter committed to the sound discretion of the trial court. See Lux v. Commonwealth, 24 Va. App. 561, 569, 484 S.E.2d 145, 149 (1997).

The issue may arise where the prosecutor has had an attorney-client relationship with the parties involved whereby he obtained privileged information that may be adverse to the defendant's interest in regard to the pending criminal charges. See, e.g., Commonwealth v. Kilgore, 15 Va. App. 684, 694, 426 S.E.2d 837, 842 (1993).  A second situation is where the prosecutor has some direct personal interest arising from a financial interest, kinship, or close friendship such that his objectivity and impartiality are called into question.  See, e.g., Cantrell, 229 Va. at 391-94, 329 S.E.2d at 24-27.  Neither of these circumstances applies to the present case.

Beyond these categories of clear and direct conflicts of interest and ethical bars to a particular attorney prosecuting a particular defendant, there is the broader consideration of whether, on the facts of a particular case, the adversarial nature of the judicial process has resulted in such enmity toward the defendant on the part of the prosecutor that it will overbear his professional judgment in seeking fairly and impartially to see justice done. See Lux, 24 Va. App. at 569, 484 S.E.2d at 149. As the United States Supreme Court has observed in a related context, " '[i]mpartiality is not gullibility. Disinterestedness does not mean child-like innocence.' " Liteky v. United States, 510 U.S. 540, 551 (1994) (quoting In re J. P. Linahan, Inc., 138 F.2d 650, 654 (2nd Cir. 1943). We are of opinion that the same can be said of the prosecutor's role.

The adversarial nature of criminal prosecutions unsurprisingly tends to engender some level of friction between the prosecutor and the defendant in difficult cases, especially where, as here, the defendant seems intent on showing his contempt and disrespect for the prosecutor. However, merely demonstrating a history of one-sided acrimony between the defendant and the prosecutor is insufficient to establish a conflict of interest or prosecutorial misconduct with respect to an otherwise proper prosecution. See, e.g., Phelps v. Hamilton,

42

59 F.3d 1058, 1067 (10th Cir. 1995).  If such were not the case, a defendant would have an incentive to deliberately incite such enmity.  The evidence must reflect that the prosecutor is acting not within the dictates of the law, but has strayed outside those parameters in furtherance of a personal animus against the defendant.

Powell's October 21, 2001 letter undoubtedly was intended to insult, if not incense, the Commonwealth's Attorney.  But, the trial court was within its discretion to accept the Commonwealth's Attorney's assurance that it had not had an effect on his professional judgment in seeking fairly and impartially to see justice done.  Moreover, nothing in the Commonwealth's Attorney's conduct of the trial evinces any lack of such professional judgment on his part.  Accordingly, we hold that the trial court did not abuse its discretion in overruling Powell's motion to disqualify the Commonwealth's Attorney.

### D. Failure to Exclude Testimony of Kristie Reed

In his ninth assignment of error, Powell contends that the trial court erred in permitting the Commonwealth to call Kristie as a witness and to give testimony concerning Powell's rape and attempted murder of her during the guilt determination phase of

his trial.[10]  He asserts that evidence of the events following the murder of Stacey was not relevant to prove his culpability for that crime and that such evidence was, in any case, unduly prejudicial.[11]

The Commonwealth responds that evidence of the rape and attempted murder of Kristie, including her testimony and its supporting exhibits, was admissible because those acts were interrelated parts of a common criminal plan and, thus, were relevant to prove Powell's identity, motive, and intent as the perpetrator of all the crimes committed in the course of carrying out that plan.  In addition, the Commonwealth contends that evidence of the subsequent attack on Kristie was probative of Powell's state of mind during the entire criminal enterprise and, thus, admissible to show premeditation in the killing of Stacey to rebut Powell's claim that the killing was accidental. We agree with the Commonwealth.

---

[10] In his pre-trial motion, Powell sought to exclude all evidence of his rape and attempted murder of Kristie.  On appeal, he has limited his argument to the exclusion of her testimony and the exhibits introduced in its course.

[11] Powell also asserts that Kristie's testimony was unnecessary because it was cumulative of other evidence and should more properly have been received as "victim impact testimony" during sentencing.  These arguments were not made at trial and, thus, are barred from consideration in this appeal. Rule 5:25.

44

Generally, evidence of other offenses is inadmissible in a criminal prosecution, but it is a well-established exception that such evidence is admissible to show a common criminal scheme when the various acts are naturally explained as the constituent parts of the defendant's general plan. See Satcher v. Commonwealth, 244 Va. 220, 230, 421 S.E.2d 821, 828 (1992), cert. denied, 507 U.S. 933 (1993); Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970); McWhorter v. Commonwealth, 191 Va. 857, 870-71, 63 S.E.2d 20, 26 (1951). In Kirkpatrick we explained that:

> [e]vidence of other offenses is admitted if it shows the conduct and feeling of the accused toward his victim . . . or if it tends to prove any relevant element of the offense charged. Such evidence is permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with . . . the offense for which the accused is on trial.

211 Va. at 272, 176 S.E.2d at 805; see also Satcher, 244 Va. at 230, 421 S.E.2d at 828.

There can be no question that it was the Commonwealth's theory in this trial, and taking the evidence in the light favorable to the Commonwealth it is an unassailable fact, that Powell went to the Reed home with the intention of raping and killing both Stacey and Kristie. As such, the evidence of Powell's rape and attempted murder of Kristie was directly probative of his motive and intent in the attempted rape and

45

murder of Stacey. Moreover, Kristie's eyewitness testimony placing Powell in the home when she arrived and identifying him as her assailant was critical to establishing Powell's identity as the perpetrator of the crimes that preceded the criminal acts committed against her.

Powell's contention that the graphic and emotional testimony of the victim of a brutal rape and attempted murder should have been excluded because its probative value was outweighed by the prejudice it would cause in the minds of the jury is equally without merit. All evidence tending to prove guilt is prejudicial to an accused, but the mere fact that such evidence is powerful because it accurately depicts the gravity and atrociousness of the crime or the callous nature of the defendant does not thereby render it inadmissible. Moreover, direct evidence, such as eyewitness testimony, is rarely subject to exclusion on the ground that it would be unduly prejudicial. In any case, determination of the issue is committed to the sound discretion of the trial court. Spencer v. Commonwealth, 240 Va. 78, 90, 393 S.E.2d 609, 617, cert. denied, 498 U.S. 908, (1990). Accordingly, we hold that the trial court did not err in failing to grant Powell's pre-trial motion to exclude the testimony of Kristie Reed from the guilt determination phase of the trial.

### E. Failure to Suppress Powell's Statements to Police

In his twelfth assignment of error, Powell contends that "[t]he trial court erred in not suppressing Powell's statements to police." Although he uses the plural term "statements" in the assignment of error and makes references to the ability of an accused to revoke a prior waiver of his right to remain silent, Powell does not expressly restate the contention made in the trial court that statements made during the initial investigation prior to his first trial should have been suppressed because at the conclusion of his first interview he stated that he had nothing more to say. Because Powell has not expressly raised this issue on brief or during oral argument, it has been waived and we will not address it. Burns, 261 Va. at 318, 541 S.E.2d at 880.

Powell does assert that the trial court erred in not suppressing the statement concerning Powell's October 21, 2001 letter that he made on November 2, 2001 while in prison to an investigator. Powell contends that because he was still represented by counsel from his first trial, the investigator should not have questioned him without his counsel being present.

The Commonwealth responds that the Sixth Amendment right to counsel had not attached with respect to the crime for which the investigator was gathering evidence and for which Powell would

47

be indicted as a result of the evidence in his October 21, 2001 letter. Moreover, as Powell executed a waiver of his Fifth Amendment rights immediately prior to giving the November 2, 2001 statement, the Commonwealth contends that the statement was properly admitted. We agree with the Commonwealth.

The Sixth Amendment right to counsel "arises from the fact that the suspect has been formally charged with a particular crime and thus is facing a state apparatus that has been geared up to prosecute him." Arizona v. Roberson, 486 U.S. 675, 685 (1988); see also Alston v. Commonwealth, 264 Va. 433, 437, 570 S.E.2d 801, 803 (2002). We have already determined that the crime for which Powell was tried and convicted in the present case was a separate offense from those for which he had been previously convicted. Powell had not been formally charged with that offense when he was interviewed on November 2, 2001 and, thus, he was not entitled to have his counsel from his prior trial present during that interview. Eaton v. Commonwealth, 240 Va. 236, 252, 397 S.E.2d 385, 394 (1990), cert. denied, 502 U.S. 824 (1991). As Powell does not dispute that he freely and knowingly waived his Fifth Amendment right to counsel at the time of the interview, we hold that the trial court did not err in failing to suppress Powell's statement.

## F. Limiting Voir Dire and Failure to Strike Jury Panel

In his fourth assignment of error, Powell contends that the trial court erred in not permitting him to question prospective jurors about whether knowledge of Powell's prior conviction for capital murder and its subsequent reversal on appeal would influence their opinion as to his guilt. Powell concedes that a prospective juror with knowledge of a defendant's prior conviction is subject to disqualification on that ground. Barker, 230 Va. at 375, 337 S.E.2d at 733. But see Patton v. Yount, 467 U.S. 1025, 1035 (1984) (refusing to grant a new trial where several jurors had pretrial knowledge of the defendant's prior conviction for the same crime). Powell contends, however, that in his case the jury would ultimately learn of his prior conviction during the trial and, thus, asserts that he should have been able to question jurors on the effect this evidence would have on them.

The purpose of voir dire is "to ascertain whether [a prospective juror] is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein." Code § 8.01-358. To that end, prospective jurors may be asked any question relevant to determine whether they may be subject to being removed from the venire for cause.

49

> The test of relevancy is whether the questions relate
> to any of the four criteria set forth in the statute.
> If an answer to the question would necessarily
> disclose, or clearly lead to the disclosure of the
> statutory factors of relationship, interest, opinion,
> or prejudice, it must be permitted.

LeVasseur v. Commonwealth, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), cert. denied, 464 U.S. 1063 (1984)

The question that Powell attempted to ask the first panel of the venire was not one that "would necessarily disclose, or clearly lead to the disclosure of the statutory factors of relationship, interest, opinion, or prejudice" of the prospective jurors. The panel had already indicated that they had no prior knowledge of the case and had not formed an opinion as to Powell's guilt or innocence. Powell's question would not have revealed any preexisting opinion or bias with respect to his case, but would instead have served to test the jurors' potential response to the evidence that he expected the Commonwealth to present.

Whether to permit a party to ask a question that goes beyond what is permissible under Code § 8.01-358 is a matter entirely within the trial court's discretion. Id. We hold that the trial court did not err in refusing to permit Powell to test the potential response of the jurors to the evidence that would be adduced at trial concerning his prior conviction.

In his eighth assignment of error, Powell contends that, having denied him the opportunity to question the potential jurors on this point, the trial court should have disqualified for cause the five members of the first panel because his attempt to question them provided them with knowledge that he had been previously convicted for the capital murder of Stacey Reed.  Thus, he contends that these jurors were subject to automatic exclusion under Barker.

Even if we were to agree that Powell's curtailed question provided the five prospective jurors with sufficient information to raise the concern for potential prejudice that the jurors' full knowledge of the defendant's prior conviction raised in Barker, that circumstance arose here through Powell's own conduct during the voir dire.  The record demonstrates that Powell's counsel was fully aware that advising the prospective jurors that Powell had been previously convicted of capital murder carried with it the potential for creating bias against his client, but apparently deemed this risk acceptable in order to seek the strategic advantage of being able to test the jurors' potential response to the evidence concerning that conviction during the trial.  Counsel further recognized the risk that the trial court would not permit him to pursue that line of questioning, and, as we have just determined, was within its discretion to do so.

Under the "invited error" doctrine Powell may not benefit from his counsel's voluntary, strategic choice to place Powell at a potential disadvantage in the hope, unproductive though it was, of gaining some advantage.  See, e.g., Moore v. Hinkle, 259 Va. 479, 491, 527 S.E.2d 419, 426 (2000); Saunders v. Commonwealth, 211 Va. 399, 400, 177 S.E.2d 637, 638 (1970); Clark v. Commonwealth, 202 Va. 787, 791, 120 S.E.2d 270, 273 (1961).  "No litigant, even a defendant in a criminal case, will be permitted to approbate and reprobate – to invite error . . . and then to take advantage of the situation created by his own wrong."  Fisher v. Commonwealth, 236 Va. 403, 417, 374 S.E.2d 46, 54 (1988), cert. denied, 490 U.S. 1028 (1989).  Accordingly, we hold that the trial court did not err in refusing to strike the members of the first voir dire panel for cause under the particular circumstances created by Powell in this case.

### G. Failure to Strike the Evidence

In his fifth assignment of error, Powell contends that the trial court erred in failing to strike the evidence as to capital murder on the ground that the Commonwealth had not adequately corroborated his confession in the October 21, 2001 letter of having attempted to rape Stacey.  Thus, Powell contends that the evidence at best would have supported a conviction for first degree murder.  We disagree.

Although the Commonwealth may not establish an essential element of a crime by the uncorroborated confession of the accused alone, "'only slight corroborative evidence'" is necessary to show the veracity of the confession.  Williams v. Commonwealth, 234 Va. 168, 175, 360 S.E.2d 361, 366 (1987) (quoting Clozza v. Commonwealth, 228 Va. 124, 133, 321 S.E.2d 273, 279 (1984), cert. denied, 469 U.S. 1230 (1985)), cert. denied, 484 U.S. 1020 (1988).  What is more, if "[t]his corroborating evidence is consistent with a reasonable inference" that the accused committed the crime to which he has confessed, the Commonwealth need not establish through direct evidence those elements of the crime that are proven by the confession.  See Jackson v. Commonwealth, 255 Va. 625, 646, 499 S.E.2d 538, 551 (1998), cert. denied, 525 U.S. 1067 (1999).

Contrary to Powell's contention that there is not even "slight" corroborative evidence to support the reliability of his confession, the forensic evidence and direct testimony are consistent with and substantiate Powell's version of "the rest of what happened" in every relevant respect.  Powell's going to the home armed when he knew Stacey would be there alone, Stacey's defensive wounds, the evidence that her pants' zipper was slightly undone, the subsequent rape of Kristie, and Powell's later concession that he raped Kristie because he "didn't get any with Stacey" all corroborate his confession to

the attempted rape of Stacey in the October 21, 2001 letter.
Accordingly, we hold that the trial court did not err in
overruling Powell's motion to strike the evidence as to capital
murder premised on the attempted rape of Stacey.

### H. Mandatory Sentence Review

In his first and second assignments of error, Powell
contends that the jury imposed the sentence of death under the
influence of passion, prejudice, or some other arbitrary factor
and that the sentence of death is disproportionate to the
penalty imposed in other cases considering both the crime and
the defendant.  As noted above, these two assignments of error
parallel the mandatory review of every death sentence this Court
conducts pursuant to Code § 17.1-313(C).  Accordingly, we will
combine the mandatory review of Powell's death sentence with our
discussion of the issues raised by Powell in his assignments of
error.

Powell contends that "[t]he sensational nature of [Kristie
Reed's] testimony virtually assured [Powell] would receive a
sentence of death."  This is so, he asserts, because "the
graphic and irrelevant evidence about the attack on Kristie"
would have enraged the jury and rendered it unable to reach an
impartial verdict.

We have already determined that evidence of the rape and
attempted murder of Kristie was relevant and admissible during

the guilt determination phase of the trial. Similarly, Powell's rape and attempted murder of Kristie was relevant for the jury's consideration of his future dangerousness during the penalty determination phase of the trial. Accordingly, Powell's assertion that the jury was influenced by "irrelevant" evidence is without merit. However, while graphic evidence of a violent crime is admissible in the guilt determination phase of a capital murder trial, we will also consider the potential impact such evidence may have had on the jury's decision to impose the death sentence during the penalty determination phase.

The brutal rape and attempted murder of a thirteen-year-old child are undoubtedly among the most abhorrent crimes that can be placed in evidence before a jury contemplating whether to impose a sentence of death upon a defendant. Nonetheless, the mere fact that the jury is presented with such evidence does not raise a presumption that the jury will be unable to set aside its natural emotions and fairly consider all the evidence. See Bailey, 259 Va. at 751, 529 S.E.2d at 586 (evidence of infanticide and uxoricide, though abhorrent crimes, did not preclude jury from making a rational sentencing determination in a capital murder trial).

Powell further contends that the trial court erred in submitting to the jury a verdict form that permitted it to impose a sentence of life imprisonment and a fine but which did

55

not expressly parallel the trial court's sentencing instructions by stating that this form was to be used if the jury found that neither aggravating factor had been proven beyond a reasonable doubt. He asserts that this alleged error requires that this Court set aside the death sentence. Powell concedes that he did not raise this issue at trial, but nonetheless contends that it is proper for this Court to consider his argument as part of the mandatory review of his sentence, apparently contending that an erroneous verdict form would constitute an "arbitrary factor" that would influence the jury's sentencing decision.

Our review of the record in this case does not disclose that the jury failed to give fair consideration to all the evidence both in favor and in mitigation of the death sentence. Moreover, the jury was properly instructed upon the sentences available and the basis for imposing them and the record supports the jury's determination to impose a sentence of death upon a finding that both aggravating factors were proven beyond a reasonable doubt. We find nothing to suggest that the jury, or the trial court in reviewing the verdict, imposed the death sentence under the influence of passion, prejudice, or other arbitrary factors. Accordingly, we hold that the sentence of death was not imposed under passion, prejudice, or any arbitrary factor.

In a separate section of his brief, ostensibly related to the assignment of error paralleling the passion, prejudice and arbitrary factor aspect of our mandatory review, Powell asserts that the alleged error in the wording of the life sentence verdict form should result in the reversal of his death sentence and a remand for a new sentencing proceeding. While we consider the entire record of a capital murder trial to determine whether the sentence of death should be set aside because of improper influence on the jury, we have previously rejected the contention that the "arbitrary factor" language of Code § 17.1-313(C)(1) permits a defendant to raise as a separate issue on appeal an issue barred by the failure to make a proper objection in the trial court by contending that the error influenced the jury's sentencing decision. See Quintana v. Commonwealth, 224 Va. 127, 148 n.6, 152 n.7, 295 S.E.2d 643, 653 n.6, 656 n.7 (1982) (rejecting assertion in dissenting opinion that mandatory review permitted challenge to form of jury verdict to be raised for the first time on appeal). Accordingly, while Powell is not precluded from arguing that the alleged error in the life sentence verdict form improperly influenced the jury's sentencing decision as a basis for commuting the death sentence, we will not consider his separate argument under the same

assignment of error as a basis for reversing that sentence and ordering a new sentencing proceeding.[12]

Powell contends that the death sentenced imposed upon him is excessive or disproportionate when compared to similar cases considering both the crime and the defendant. Powell's sole contention is that his history of mental health problems and his failure to receive adequate treatment when in state custody as a juvenile militates against the appropriateness of the death penalty in his case. We disagree.

Code § 19.2-264.4(B) lists as a mitigating factor the fact that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired." The psychologist called by Powell did not offer a specific diagnosis of Powell's mental health problems, merely classifying them generally as suggesting an anti-social personality disorder and "a mood disorder, primarily depressive in nature . . .

---

[12] Powell also contends that the "ends of justice" exception of Rule 5:25 would permit us to consider the alleged error in the life sentence verdict form as a basis for reversing his death sentence and ordering a new sentencing proceeding. However, as Powell cannot argue for reversal of his death sentence under the assignment of error paralleling the mandatory review of that sentence and failed to make this issue the subject of a separate assignment of error, the issue is not properly before us. Rule 5:17. Accordingly, we will not address this issue as a basis for reversing the sentence of death and remanding for a new sentencing proceeding.

characterized by irritability, short temper and so forth." The psychologist did not testify that Powell lacked the ability to appreciate the criminality of his conduct or that his condition significantly impaired his ability to conform his conduct to the requirements of the law.

The jury heard this testimony concerning Powell's mental health problems, and we must assume that the jury followed the trial court's instruction to consider evidence presented in mitigation. The jury clearly concluded that Powell's history of mental health problems did not mitigate his offense. See Swann v. Commonwealth, 247 Va. 222, 238-39, 441 S.E.2d 195, 206-07, cert. denied, 513 U.S. 889 (1994) (death sentence imposed despite "history of mental health hospitalization and treatment"); Hoke v. Commonwealth, 237 Va. 303, 313, 377 S.E.2d 595, 601, cert. denied, 491 U.S. 910 (1989) (death sentence imposed despite evidence of defendant's prior confinement in nine or ten mental hospitals); Giarratano v. Commonwealth, 220 Va. 1064, 1076-79, 266 S.E.2d 94, 101-103 (1980) (death sentence imposed despite mitigating evidence of defendant's "schizoid personality disturbance" and "extreme mental and emotional disturbance").

Apart from Powell's contention that his history of mental health problems should preclude the imposition of a death sentence in his case, we are required by Code § 17.1-313(C)(2) to conduct a comparative review of the death sentence imposed in this case with other capital murder cases, including those where a life sentence was imposed.  "The purpose of our comparative review is to reach a reasoned judgment regarding what cases justify the imposition of the death penalty."  Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, 529 U.S. 1113 (2000).  In conducting this statutorily mandated review in this case, we have focused on cases in which the victim was murdered during the commission of rape or attempted rape, and in which the sentence of death was imposed based on findings of both future dangerousness and vileness.  See, e.g., Patterson v. Commonwealth, 262 Va. 301, 551 S.E.2d 332 (2001); Swisher v. Commonwealth, 256 Va. 471, 506 S.E.2d 763 (1998), cert. denied, 528 U.S. 812 (1999); Pruett v. Commonwealth, 232 Va. 266, 351 S.E.2d 1 (1986), cert. denied, 482 U.S. 931 (1987); Coleman v. Commonwealth, 226 Va. 31, 307 S.E.2d 864 (1983), cert. denied, 465 U.S. 1109 (1984); Mason v. Commonwealth, 219 Va. 1091, 254 S.E.2d 116, cert. denied, 444 U.S. 919 (1979); Smith v. Commonwealth, 219 Va. 455, 248 S.E.2d 135 (1978), cert. denied, 441 U.S. 967 (1979).  We have also considered cases in which defendants received life sentences,

60

rather than the death penalty, for capital murder during the commission of rape or attempted rape. See, e.g., Horne v. Commonwealth, 230 Va. 512, 339 S.E.2d 186 (1986); Keil v. Commonwealth, 222 Va. 99, 278 S.E.2d 826 (1981). Considering all the factors revealed by the record, both those favoring imposition of the death sentence and those in mitigation against it, we hold that the sentence is neither excessive nor disproportionate to the penalties imposed by other sentencing bodies in the Commonwealth for comparable crimes.

## III. CONCLUSION

Having found no error below and perceiving no other reason to commute or set aside the sentence of death, we will affirm the judgment of the trial court.

Affirmed.