PRESENT:  All the Justices

YACOUB SIDYA

v.  Record No. 201007

WORLD TELECOM EXCHANGE
COMMUNICATIONS, LLC

OPINION BY
JUSTICE D. ARTHUR KELSEY
MARCH 24, 2022

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Bruce D. White, Judge

In this case, World Telecom Exchange Communications, LLC ("World Telecom"), a

wholly owned American subsidiary of a Dubai parent company, sued Yacoub Sidya claiming

that he had engaged in the misappropriation of protected trade secrets, tortious interference with

a business expectancy, and civil conspiracy.  The case has been before us on two prior occasions,

each resulting in a partial reversal and remand.  In this third appeal, we address the remaining

contests between these parties and conclude that the trial court's latest decision should be

affirmed in part, reversed in part, and remanded.[1]

I.

Our two prior orders summarize much of the background of this dispute.  *See generally*

*World Telecom Exch. Commc'ns, LLC v. Sidya*, Record No. 180901, 2019 WL 3238643 (Va.

July 18, 2019) (unpublished) (*Sidya II*); *World Telecom Exch. Commc'ns, LLC v. Sidya*, Record

Nos. 160666, 160672, 160895, 2017 WL 3084091 (Va. July 20, 2017) (unpublished) (*Sidya I*).

The present appeal is from a partial final judgment in favor of World Telecom against Sidya for

- compensatory damages of $1.332 million, trebled to $3.996
  million;

---

[1] The trial court entered a partial final judgment pursuant to Rule 1:2 because all claims
against Sidya had been resolved.  *See generally* Kent Sinclair & Leigh B. Middleditch, Jr.,
Virginia Civil Procedure § 17.3[F], at 1266-69 (7th ed. 2020) (discussing partial final judgments
under Rule 1:2).  Claims against other parties, however, remain unresolved in the trial court.

- punitive damages of $350,000;

- attorney fees incurred while preparing for and attending the 2015 trial that total $1.682 million, as well as post-trial, supplemental attorney fees of $500,000;

- post-judgment interest of 6% per annum, calculated from the date of the 2015 jury verdict, applied to the compensatory damages, trebled damages, punitive damages, and attorney fees attributable to the 2015 trial; and

- post-judgment interest of 6% per annum, calculated from the March 2020 order, applied to the post-trial, supplemental attorney fees.

In this appeal, Sidya challenges various aspects of each of the trial court's holdings. We will address each issue beginning with the most basic: whether to overturn the jury verdict against Sidya on World Telecom's claims.

## II.

### A. SUFFICIENCY OF THE EVIDENCE

"Pursuant to Code § 8.01-680, the standard of review for determining the sufficiency of evidence on appeal is well established." *Nolte v. MT Tech. Enters., LLC*, 284 Va. 80, 90 (2012) (alterations and citation omitted). "The reviewing court must examine the evidence in the light most favorable to . . . the prevailing party at trial, and the trial court's judgment will not be disturbed unless it is plainly wrong or without evidence to support it." *Id.* "When the law says that it is for the jury to judge of the credibility of a witness, it is not a matter of degree." *Simpson v. Commonwealth*, 199 Va. 549, 557 (1957) (citation omitted).

After an eight-day trial, the jury found in favor of World Telecom on three of the counts it had alleged against Sidya: misappropriation of trade secrets, tortious interference with a business expectancy, and civil conspiracy. Sidya argues that the jury verdict on all three counts must be set aside because it is plainly wrong or without evidence to support it. We disagree.

2

Evidence at trial demonstrated that in November 2010, Sidya and Mohammad Barmawi decided to start their own telephony business called SBC FZ, LLC ("SBC"). Barmawi was at the time CEO of World Telecom, and Sidya owned Y-Telecom, which was a vendor to World Telecom. While Barmawi was still employed at World Telecom, Barmawi and Sidya planned together to price World Telecom out of one of their most successful markets — the country of Mauritania. Barmawi prepared price-increase information for the Mauritania market and e-mailed it to Sidya for Sidya to send to World Telecom as if it had come from Sidya's company, Y-Telecom. In the e-mail, Barmawi said that they needed to act now because Mauritania was World Telecom's "bread and butter." *See* Pl.'s Ex. 246. He warned Sidya to "not go forward[ing] this e-mail hahahaha." *Id.* Later that day, Sidya e-mailed the pricing information to World Telecom as if it had come from him. In reply to the e-mail, Barmawi pretended that the increase was "shocking." Pl.'s Ex. 95, at 4.

At trial, Barmawi and Sidya claimed that the price increase was based upon a tax in Mauritania, but Barmawi admitted that it was "a business decision that [he] made to protect SBC." Trial Tr. (Aug. 13, 2015) at 88-89. Sidya conceded that he knew Barmawi was "playing games" with World Telecom. *Id.* at 188. As a result of the scheme, World Telecom was forced to abandon all business in Mauritania, which was a "major, major problem for [World Telecom] with regards to revenue and cost." Trial Tr. (Aug. 11, 2015) at 33-34.

World Telecom presented evidence that Sidya and Barmawi recruited World Telecom's employees and that these employees used World Telecom's data and resources for SBC while they were still employed at World Telecom. Under Sidya's direction, the CFO of World Telecom used World Telecom's financial data at bank meetings for SBC while still employed for World Telecom. *See* Trial Tr. (Aug. 12, 2015) at 63-66, 69-74; Pl.'s Ex. 238; Pl.'s Ex. 262.

3

World Telecom also presented uncontradicted evidence of a data breach perpetrated by SBC's employees. World Telecom stored its confidential data in a password-protected program called OrcaWave. This included data for its customers and vendors — pricing information, margins, costs, and route matrixes. OrcaWave was "the Holy Grail of the company." Trial Tr. (Aug. 10, 2015) at 148. Before departing World Telecom for SBC, the chief technology officer, David Hart, created an unauthorized username and password for OrcaWave. At trial, Barmawi, Hart, and Jung Kim (another SBC employee) admitted that they had used this unauthorized username and password to regularly access World Telecom's data. Hart also admitted that he had discussed the username with Sidya but had not given him the password. *See* Trial Tr. (Aug. 12, 2015) at 144-45.

OrcaWave's usage report showed that the unauthorized username was used over 850 times in a six-month period. World Telecom's computer forensic analyst testified that the login information had been used by SBC employees Barmawi, Hart, Kim, and Satanand Atwaru. He also stated that he "would not agree" with the "suggestion that nothing ties Yacoub Sidya" to accessing the OrcaWave information because evidence indicated that the unauthorized username had been used in Mauritania (Sidya's place of residence). Trial Tr. (Aug. 17, 2015) at 63-64.

In its data breach, SBC employees accessed World Telecom's margin reports, account history reports, rate addendum archives, and cost reports. These reports included information about the customers' minutes, procedure ratios, revenue and cost margins, billing statuses, rates, and previous offers. World Telecom presented e-mails demonstrating that SBC employees had used this information to undercut World Telecom. *See* Trial Tr. (Aug. 12, 2015) at 127-29; Pl.'s Ex. 196; Pl.'s Ex. 229. The president of World Telecom testified that in the first six months of

4

2011, they could not understand why the company's margins were being squeezed and why they were losing so many customers — until he discovered the data breach.

World Telecom presented evidence from a research analyst who qualified as an expert in the wholesale telephony industry. He testified that the telephony industry was still a "viable market" with $92 billion of annual revenue, an average of 6-7 percent annual growth, and 15-18 percent annual growth in Africa and South Asia. Trial Tr. (Aug. 17, 2015) at 103-04. World Telecom also presented expert testimony as to the diminution in value of the business from December 2010 to December 2011. The expert opined that "the data reflected that there was a total destruction of the business" and that after the OrcaWave data breach, World Telecom was "never profitable again." *See id.* at 120-21, 152.

Given the evidence, the jury's verdict was not plainly wrong or without evidence to support it. "Under Virginia's Uniform Trade Secrets Act (VUTSA), an owner of 'trade secrets' may be entitled to damages when it can prove 'misappropriation' by another." *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 205 (2016) (citation omitted). As to the trade-secrets count, Sidya does not deny the data breach that occurred through the unauthorized access to OrcaWave. Instead, he argues only that he knew nothing about it. The evidence, however, suggested otherwise. Hart testified that he told Sidya about the username, and the forensic analyst found that someone had logged in to OrcaWave with the unauthorized username and password multiple times from a computer in Mauritania. The jury reasonably distrusted Sidya's claim of ignorance and inferred from the evidence that he was actively involved in the misappropriation of World Telecom's trade secrets.

As to the claim for tortious interference with a business expectancy, World Telecom needed to prove that Sidya had known of a World Telecom business expectancy and that he had

5

used improper means to intentionally interfere with that expectancy.  *See Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 403 (2012).  The evidence demonstrates a number of business expectancies, including World Telecom's ongoing relationships with its customers and vendors, that were interfered with by Sidya and his co-conspirators using confidential information from employees while they were still working at World Telecom and using confidential information from the OrcaWave database.  The evidence thus supports the jury's verdict on this count.

Finally, to prove a civil conspiracy under Code § 18.2-499, "a plaintiff must establish: '(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business; and (2) resulting damage to plaintiff.'"  *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214 (2014) (alteration and citation omitted).  Sidya and Barmawi deceived World Telecom in order to price them out of the Mauritania market, worked with an active employee of World Telecom to take and use World Telecom's financial data, and used World Telecom's confidential data to undercut World Telecom and steal customers for at least six months.  These facts sufficiently proved a civil conspiracy by clear and convincing evidence.

We also find that the evidence was sufficient to establish that Sidya's actions caused harm to World Telecom under each of these counts.  The testimony of both World Telecom's owner and the damages expert identified the actions of Sidya and his co-conspirators as causing the destruction of World Telecom's business.

Having examined the facts and inferences in the light most favorable to World Telecom, we find that the evidence was sufficient to support the jury's verdict on all three counts.

6

Because "the parent company and one of two plaintiffs . . . ha[d] been stricken from the case," we instructed the trial court to "hold a hearing to determine what portion of the damages should be allocated to . . . World Telecom Exchange Communications, LLC." *Sidya II*, 2019 WL 3238643, at *2. On remand, the trial court held a hearing and determined that the portion of damages allocable to World Telecom was $1.332 million. That award, Sidya now argues, violated our appellate mandate because the trial court did not specifically allocate a percentage of the damages to World Telecom but rather calculated a whole new attribution of damages. Upon this subtle distinction between allocation and attribution, Sidya contends that we should vacate the trial court's award in its entirety based upon the mandate rule. We decline to do so.

In Virginia, an appellate mandate "is the directive of the appellate court certifying a judgment in a particular case to the court from which it was appealed" and thus "speaks only to that case." *Powell v. Commonwealth*, 267 Va. 107, 128 (2004). The mandate controls "only 'as to matters within its compass.'" *Id.* (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)). The mandate does not prohibit a trial court on remand "from acting on matters not constrained by the language of the mandate, construed in light of the appellate court's opinion." *Id.* While a trial court must obey "both the letter and spirit" of an appellate mandate, the mandate rule only precludes the trial court from considering issues that "the mandate laid at rest." *United States v. Bell*, 5 F.3d 64, 66-67 (4th Cir. 1993) (citations omitted). Best understood, the rule is "merely a 'specific application of the law of the case doctrine,'" which has the effect of foreclosing "relitigation of issues expressly or impliedly decided by the appellate court." *Powell*, 267 Va. at 128 (citation omitted).

Before applying these background principles, we first question Sidya's view of the trial court's damages ruling on remand. At the 2015 trial, the jury returned a $2.682 million verdict for compensatory damages. It was a general verdict unaccompanied by special interrogatories. The jury awarded a single sum to two plaintiffs who were each asserting identical claims. On remand, the trial court awarded $1.332 million to one plaintiff, which was a "portion" of the original $2.682 million jury verdict against both plaintiffs, *see Sidya II*, 2019 WL 3238643, at *2. Whatever linguistic distinctions exist between "allocating" and "attributing," nothing in our *Sidya II* order (incorporated by reference in the mandate) dictated the precise manner in which the trial court was obligated to apportion the damages. For this reason, the trial court did not ignore or otherwise violate the *Sidya II* mandate.

Perhaps so, Sidya argues, but the trial court had no evidentiary basis for allocating $1.332 million of the original jury verdict to World Telecom. One difficulty with this argument is that no one can say with confidence what the jurors would have done on this issue. Neither side of this case asked the trial court to instruct the jury to allocate damages between the two plaintiffs, nor did the parties submit a detailed verdict form or request special interrogatories on the damages-allocation issue.

In the first appeal in this case, *Sidya I*, neither side requested a remand for a new jury trial. Again, in *Sidya II*, both sides requested for this Court to enter final judgment on their behalf, and neither side insisted on a new jury trial limited to the question of damages.[2] As a result, our *Sidya II* mandate used the most efficient method left for bringing this case to

---

[2] *See* Appellant's Br. (*Sidya II*) at 40; Appellee's Br. (*Sidya II*) at 40. In oral arguments for *Sidya II*, World Telecom acknowledged that we could remand the case for the trial court to either remit the damages or order a new jury trial on the apportionment of damages. *See* Oral Argument Audio (*Sidya II*) at 7:40 to 8:40.

closure — a remand with instructions to the trial court to apportion damages. In doing so, we vested the trial court with the same factfinding discretion the jury had previously possessed (subject only to the restraints of the existing evidentiary record) and directed the court to answer a question the jury was never asked.

This brings us to Sidya's contest of the trial court's apportionment decision, which Sidya claims relied upon a "completely different approach" than the one World Telecom presented to the jury and later "abandoned." *See* Appellant's Br. at 34.[3] In support of his argument, Sidya asserts that World Telecom's expert at the jury trial calculated damages using an income-based approach to value the consolidated business. The trial court's post-remand award, Sidya contends, calculated damages using an asset-based approach. Our review of the record, however, does not support this assertion.

At trial, World Telecom's damages expert calculated the value of the combined companies in December 2010 (before Sidya's tortious acts) and subtracted from that the value of the remaining assets in December 2011, which was the only remaining value after Sidya's tortious acts. The expert evaluated the companies as of December 2010 using a combination of the income approach and market approach. *See* Trial Tr. (Aug. 17, 2015) at 123-24, 129. In making these determinations, the expert evaluated World Telecom and its parent company jointly, as if they were one enterprise, and did not seek to divide the damages between them. *See id.* at 178-79.

_____

[3] One particularly unfair aspect of this change of strategy, Sidya contends, was World Telecom's reliance in the trial court on deposition testimony not presented to the jury at the 2015 trial. The record reflects, however, that the trial court emphasized its intent to rely only on evidence previously presented to the jury. *See, e.g.*, J.A. at 156-57. Additionally, the deposition testimony identified by Sidya was the $1.8 million offer made for World Telecom, which was also testified to at trial by both World Telecom's owner and by the damages expert. *See* Trial Tr. (Aug. 11, 2015) at 26; Trial Tr. (Aug. 17, 2015) at 150.

On remand, the trial court also determined damages by finding the value of World Telecom as of December 2010 and subtracting from that the value of its remaining assets as of December 2011. In determining the initial value of World Telecom, the trial court adopted what World Telecom called a "lowball number" based upon a purchase offer that Sidya had made for the company in January 2011. *Id.* at 162.[4] Sidya argues that this purchase offer was for both companies, but the evidentiary record supports the trial court's determination that this offer represented the value of World Telecom alone. At the time of the offer, Sidya and Barmawi had already established a parent company in Dubai — they needed only the subsidiary.

World Telecom, after all, operated the business, employed all but one of the company's officers and employees, and owned the "OrcaWave" servers and the trade secrets contained therein. *See* J.A. at 179-80; Trial Tr. (Aug. 10, 2015) at 132-36; Trial Tr. (Aug. 17, 2015) at 14-15. In contrast, World Telecom's Dubai parent company had at most two employees. The parent company's principal contribution to the joint business plan was to provide financing, banking services, and tax benefits for income realized in Dubai. After deducting World Telecom's remaining assets, the trial court arrived at the $1.332 million allocation of damages to World Telecom — which, as it turns out, is close to half of the $2.682 million in damages awarded by the jury to both World Telecom and its Dubai parent company. Given the evidentiary discretion available to the trial court, sitting as factfinder on remand, we affirm the court's damages-allocation decision.

## C. TREBLE DAMAGES FOR CIVIL CONSPIRACY

For two reasons, Sidya argues that the trial court erroneously trebled the compensatory-

---

[4] World Telecom offered this valuation as a floor or "backstop" (estimating it as "approximately . . . half" of World Telecom's true value) to its other higher valuation figures. *See* Hr'g Tr. (Feb. 27, 2020) at 7-8; Trial Tr. (Aug. 10, 2015) at 26.

damages award to $3.996 million. First, Sidya finds fault with the post-remand decision[5] to treble damages because only one of the various claims against him — the civil conspiracy claim under Code §§ 18.2-499 and 18.2-500(A) — authorized such an award, and the jury did not specify the amount of damages caused by the civil conspiracy. Second, Sidya contends that the trial court mistakenly interpreted the civil conspiracy statute to require a mandatory award of trebled damages rather than a discretionary award.

With respect to the first point, Sidya is correct that the jury did not break down the aggregate award into discrete subsets of damages allocable to each specific successful claim. The trial court recommended that a damages award be designated by individual count on the jury-verdict form, but both parties disagreed. Sidya never advocated for a distinct damages award on the civil conspiracy count and, in fact, agreed with the jury-verdict form. Sidya cannot fault the trial court, therefore, for interpreting the jury verdict to attribute the full damages award to each count jointly and separately.

As for Sidya's second point, arguing that the trial court mistakenly treated the treble-damages award as statutorily mandated, we agree that the court came to that conclusion, but we see no need to determine whether the court erred in doing so. *See Rickman v. Commonwealth*, 294 Va. 531, 542 (2017) (applying the right-result-different-reason doctrine to affirm the trial court's judgment while "express[ing] no view on the correctness of the lower court's rationale"). The trial court made clear that while it believed treble damages were mandatory, it would

---

[5] In 2015, the trial court denied World Telecom's post-trial motion for treble damages. Our rulings in *Sidya I* and *Sidya II*, however, effectively "wipe[d] the slate clean on remand to just after the jury rendered its verdict." *Sidya II*, 2019 WL 3238643, at *2 (citation omitted). After the *Sidya II* remand, the trial court changed its decision and ordered treble damages to be awarded. We have no concerns about this post-remand decision. World Telecom appealed the earlier decision to deny a trebled award, and we remanded the issue back to the trial court. *See Sidya I*, 2017 WL 3084091, at *2 n.2. The issue was properly before the trial court on remand.

nevertheless exercise its discretion in awarding treble damages in this case if the statute merely authorized a discretionary award. Because Sidya did not assign error to this "separate and independent basis" for the trial court's treble-damages award, *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 421 (2012), we affirm the court's discretionary award of treble damages and decline to address the question whether the statute mandates such an award under the circumstances of this case.

### D. ATTORNEY FEES

We turn next to Sidya's contest of the jury's award of attorney fees attributable to the 2015 trial totaling $1.682 million and to Sidya's objection to the trial court's award of supplemental attorney fees of $500,000 incurred after the verdict on appeal and on remand. On the first subject, Sidya argues that World Telecom presented the jury a wholly insufficient evidentiary basis for any award of attorney fees. We agree.

World Telecom did not assert any contractual right to attorney fees. World Telecom's claim for fees was compensable, if at all, only if it proved a violation of the Virginia Uniform Trade Secrets Act, Code § 59.1-338.1 (addressing "willful and malicious" violations), or the civil conspiracy statute, Code § 18.2-500(A), both of which authorize an award of attorney fees. These statutes, however, only authorize fees incurred in the prosecution of these specific statutory claims — not causes of action created by other statutes or by common law.

At trial, Sidya moved to strike the evidence for attorney fees as insufficient. The trial court initially took the motion under advisement, and after the trial, it granted the motion. The trial court noted that in support of over $1.6 million dollars in fees the plaintiffs had only testified from a brief summary of the fees, and "[n]o further documentation was provided." Hr'g Tr. (Oct. 23, 2015) at 34-36.

12

On appeal, Sidya contends that World Telecom presented the jury with no fee invoices, time records, or witness estimations of the portion of the fee claim attributable solely to prosecution of the trade secrets and civil conspiracy claims (as opposed to the other non-fee claims) asserted against Sidya (as opposed to the various other defendants). What is more, a portion of the fees involved legal work during several years prior to the civil action being filed against Sidya. In response, World Telecom suggests that the fees did not need to be divided by claim or by defendant because all of the legal work compensated by the requested fees would have had to be performed to support the specific fee-shifting claims against Sidya. The judge who presided over the 2015 trial found this supposition unsupported by the evidence. We do as well.[6]

A prevailing party entitled by law to an award of attorney fees has the burden of proving "that the requested fees are reasonable and that they were necessary." *West Square, L.L.C. v. Communication Techs., Inc.*, 274 Va. 425, 433 (2007). For a fee award to survive appellate scrutiny, it must be supported by sufficient evidence that tailors the fees to the specific successful claims triggering the right to such an award (statutory, contractual, or otherwise) and to the specific defendants against whom the claims could be asserted. *See Manchester Oaks Homeowners Ass'n*, 284 Va. at 428-29 ("[I]n an action encompassing several claims, the prevailing party is entitled to an award of costs and attorneys' fees only for those claims for which (a) there is a contractual or statutory basis for such an award and (b) the party has prevailed."). Nowhere in the extensive record in this case is there sufficient evidence on these necessary elements of World Telecom's fee claim. For this reason, agreeing with the judge who

_____

[6] A different judge presided over this case on remand from *Sidya II*, who disagreed with the earlier trial judge's decision and awarded the attorney fees challenged in this appeal.

13

presided over the jury trial and disagreeing with his colleague's later decision to the contrary, we vacate the $1.682 million award of attorney fees attributed to the 2015 trial.

On remand after *Sidya II*, World Telecom presented evidence to the trial court in support of supplemental attorney fees incurred after the 2015 trial. In a single sentence in his brief, Sidya argues that these supplemental fees should not be permitted because World Telecom again failed to demonstrate that the fees were incurred only on the civil conspiracy and trade secrets claims. *See* Appellant's Br. at 48. At the hearing to determine fees, however, World Telecom presented detailed evidence as to the specific work encompassed in the requested fees. The evidence distinguished between successful and unsuccessful arguments — with an example of the latter being the failed defense of the parent company's untimely registration in *Sidya I*, *see* Hr'g Tr. (Feb. 27, 2020) at 121-22. World Telecom presented evidence of over $900,000 in attorney fees on post-trial work, and the trial court ultimately awarded $500,000. We find that the trial court did not abuse its discretion in doing so.

### E. POST-JUDGMENT INTEREST

The trial court awarded post-judgment interest of 6% per annum, which was calculated from the date of the 2015 jury verdict, and applied that interest rate to the trebled compensatory damages, punitive damages, and the attorney fees attributable to the 2015 trial. The court also awarded interest on the post-trial, supplemental attorney fees running from the date of the March 2020 order. Sidya argues that the trial court erred to the extent that it awarded interest on the $350,000 punitive-damages award and on the treble-damages award.[7] Sidya also argues that

---

[7] Sidya also argues that post-judgment interest cannot be awarded on a recovery of attorney fees. We have never addressed this precise issue, though others have. *See* 2004 Op. Atty. Gen. 26, 26-28; 1991 Op. Atty. Gen. 23, 24. Given our reversal of the attorney-fee award,

14

interest should run from the date of the March 2020 judgment rather than the date of the 2015 jury verdict.

This debate over interest arises in a rather unique context. The jury rendered its verdict on August 20, 2015, and the trial court entered its judgment on the verdict on September 18, 2015. We vacated the judgment (but not the verdict) in July 2017. *See Sidya I*, 2017 WL 3084091, at *5. We later vacated the trial court judgment entered on remand, *see Sidya II*, 2019 WL 3238643, at *2, and we are now considering a post-judgment interest award entered in March 2020 running from the August 2015 verdict.

Despite this convoluted storyline, one aspect of Code § 8.01-382 answers the question whether post-judgment interest applies to awards of punitive and treble damages. That statute provides:

> [T]he final order, verdict of the jury, or if no jury the judgment or decree of the court, may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence. The final order, judgment or decree entered shall provide for such interest until such principal sum be paid. If a final order, judgment or decree be rendered which does not provide for interest, the final order, judgment or decree awarded or jury verdict shall bear interest at the judgment rate of

_____

*supra* at 12-14, we need not address the question whether the attorney-fee award for pretrial and trial efforts is covered by Code § 8.01-382.

In a single sentence in a footnote, Sidya includes the interest on the award of supplemental attorney fees in his argument. *See* Appellant's Br. at 43 n.4. In response to this very brief discussion, *see AlBritton v. Commonwealth*, 299 Va. 392, 412 & n.12 (2021) (discussing what is "colloquially called bad-brief waiver"), we will make only a few observations. The fees in this case were not awarded as compensatory damages either in tort law, *see generally* Kent Sinclair, Sinclair on Virginia Remedies § 1-8[A], at 1-39 (5th ed. 2016) (listing exceptions to the "American Rule"), or as an element of damages arising out of a breach of a contractual duty. Instead, the fees here are entirely a product of statutory awards that are typically deemed to be in the nature of costs. *See* Code § 18.2-500(A) (allowing recovery for "costs of the suit, including a reasonable fee to plaintiff's counsel"); *cf. Scott v. Doughty*, 130 Va. 523, 527 (1921). Because these issues are not adequately developed in Sidya's appellate briefs, however, we reject Sidya's argument on this issue without further comment.

15

interest as provided for in § 6.2-302 from its date of entry or from the date that the jury verdict was rendered.

The "principal sum awarded" phrase serves as the predicate for an award of statutory interest. We understand the phrase to mean the "element of the plaintiff's damages that *compensates* the plaintiff for the *actual harm* sustained." *RGR, LLC v. Settle*, 288 Va. 260, 295 (2014) (emphases added) (quoting *Upper Occoquan Sewage Auth. v. Black Constr. Co.*, 275 Va. 41, 67 (2008)). This understanding necessarily excludes recoveries that are noncompensatory in nature and those that, while compensating a litigant in the broadest sense, do not remedy an actual harm sustained by the litigant.[8]

Sidya argues that punitive damages and treble damages do not fit within the scope of Code § 8.01-382. We agree. As Justice Roush said during her earlier service on the trial bench, "punitive damages, by definition, are not intended to compensate the plaintiff. Instead, they are intended to punish the defendant and to serve as an example to others from acting in a similar way." *LeBrun v. Yakeley*, 67 Va. Cir. 122, 123 (Fairfax Cnty. Cir. Ct. 2005). Her succinct observation summarizes a century of jurisprudence on the nature of punitive damages. *See* Arthur G. Sedgwick, Elements of Damages 85 (1896); Sinclair, *supra* note 7, § 3-4[A], at 3-44. The same can be said of "treble damages," which, under Virginia law, are also "in the nature of a

---

[8] A statutory award of post-judgment interest under Code § 8.01-382 requires "such interest until such principal sum be paid." The phrase "such principal sum" refers to any award of pre-judgment interest on a "principal sum awarded" in the first sentence of the statute. *See* Code § 8.01-382. In this respect, the Virginia statute is unlike its federal counterpart. *See* 28 U.S.C. § 1961(a) (2000) (mandating post-judgment interest "on any money judgment in a civil case"); *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 290 (9th Cir. 1995) ("Accordingly, postjudgment interest has been applied to attorneys' fees; costs; punitive damages; exemplary damages; and fraud penalties." (citations omitted)). *Compare Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1032 (4th Cir. 1993) (awarding post-judgment interest on the entire sum awarded, including pre-judgment interest), *with Upper Occoquan Sewage Auth. v. Blake Constr. Co.*, 275 Va. 41, 67 (2008) (declining to award post-judgment interest on a pre-judgment interest award).

penalty." *Porter v. Wilson*, 244 Va. 366, 372 (1992) (citing *Bowers v. Westvaco Corp.*, 244 Va. 139, 150 (1992)); *see also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 528-29 (4th Cir. 1997). It follows that the trial court erred in applying Code § 8.01-382 to World Telecom's punitive damages and treble damages because they were meant to punish Sidya not to compensate World Telecom.

Finally, Sidya argues that because we vacated the 2016 judgment in *Sidya I*, there was no "principal sum awarded" until the March 2020 judgment. We disagree. "Code § 8.01-382 is clear and unambiguous as to when, and how, the application of post-judgment interest begins." *Upper Occoquan Sewage Auth.*, 275 Va. at 64. "[I]f a jury determines through its verdict that money damages are owed to a plaintiff, . . . post-judgment interest will accrue from the date of the verdict until the judgment is paid." *Id.*; *see also* Sinclair & Middleditch, *supra* note 1, § 3.16, at 404. This is true even if the amount of the jury verdict is later reduced by the trial court. *Upper Occoquan Sewage Auth.*, 275 Va. at 64 n.9.

## III.

In sum, we reject Sidya's challenges to the trial court's partial final judgment on the grounds that it:

- rested on insufficient evidence supporting World Telecom's trade secrets, tortious interference, and civil conspiracy claims;
- failed to comply with *Sidya II*'s remand instructions in determining compensatory damages;
- improperly trebled damages under Code § 18.2-500(A);
- erroneously awarded supplemental attorney fees and interest thereon; and
- incorrectly ran the award of interest from the date of the jury verdict rather than the date that judgment was entered on the verdict.

We affirm the trial court's holdings on each of these issues.

17

We agree with Sidya that the trial court erred in refusing to strike the evidence offered in support of World Telecom's claim for attorney fees incurred before and during trial. We also agree that the court erred in awarding post-judgment interest on the punitive and treble damages. We thus reverse the trial court's holdings on these issues and direct the court to amend its partial final judgment accordingly.[9]

*Affirmed in part,*
*reversed in part,*
*and remanded.*

---

[9] The consolidated record in this case has swelled to over 16,000 pages. The parties appear to have exhausted themselves on every possible issue that could be contested. Because this case will again return to the trial court on remand, we suggest that the court consider ordering the parties to participate in an orientation session pursuant to Code § 8.01-576.5. If the trial court in its discretion chooses to do so, we encourage the parties to continue to participate in the judicial dispute resolution process until all remaining contests, if any, have been brought to closure.

18