COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Causey, Friedman and Senior Judge Clements
Argued at Richmond, Virginia


MICHAEL LEE JACKSON, JR.

                                          MEMORANDUM OPINION[*] BY
v.        Record No. 1527-23-2              JUDGE FRANK K. FRIEDMAN
                                               APRIL 1, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

Charles R. Samuels (McCandlish Holton, PC, on brief), for
appellant.

Robert D. Bauer, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Michael Lee Jackson, Jr. of indecent liberties with a child and three counts

of aggravated sexual battery of a victim between 13 and 17 years old.  By final order dated August

18, 2023, the Circuit Court of Spotsylvania County sentenced Jackson to 40 years' imprisonment

with 25 years suspended.  Jackson now appeals.

BACKGROUND

Jackson's Abuse of H.J.

Jackson is the biological father of H.J., the victim.  Jackson was not in H.J.'s life when she

was a young child, and H.J. did not meet Jackson until she was about 12 years old in 2016 or 2017.

That year, Jackson, along with his girlfriend at the time, moved in with Monica, H.J.'s mother, in

Spotsylvania County.  Jackson later moved out of Monica's house but returned in 2019.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

Jackson first sexually assaulted H.J. when she was 12 years old.  While driving H.J. to see her brother in Charlottesville, Jackson pulled the car over and moved H.J.'s head onto his penis and held it there while he masturbated.  After that incident, Jackson sexually assaulted H.J. at his mother's house in Virginia Beach.  Jackson and H.J. were alone in the house and Jackson took H.J. into a bedroom, told her that "[she] want[ed] it," took off his clothes, and then took off H.J.'s clothes.  H.J. told Jackson to "stop," but Jackson "had sex" with her.

Two days after Jackson assaulted H.J. in Virginia Beach, she confided to her best friend, A.F., about the incident.  H.J. texted A.F. that Jackson had raped her and taken her virginity.  A.F. reported this to her own mother, and, on July 28, 2019, A.F.'s mother called and sent text messages to Monica to relay the information.  Monica confronted H.J. about this information; H.J. was "scared" and falsely told her mother that "it didn't happen."

Jackson had sex with H.J. at least "eight or nine" times at their house in Spotsylvania County.  These assaults occurred in H.J.'s room, in her sister's room, and in the living room of the house.  After one such assault, Monica discovered Jackson lying in bed, holding H.J. while she was naked.  Jackson was wearing pajamas and "was holding onto [H.J.] in the way that you would hold on to your girlfriend if you were in bed asleep."  H.J. and Jackson told Monica that he was merely helping H.J. after she had urinated on herself because she needed help after a recent knee surgery.  On another occasion, H.J.'s sister, C.J., saw Jackson leave H.J.'s room while H.J. remained inside, naked.[1]

Jackson eventually impregnated H.J.  Jackson unsuccessfully tried to procure an abortion for H.J. without Monica's knowledge.  To explain her pregnancy, Jackson told Monica that he had taken H.J. to a party, that H.J. had been in a room with "some guys," and that when Jackson found

---

[1] Jackson also sexually assaulted H.J. at a hotel in Spotsylvania County near her house. Jackson's girlfriend was also involved in this assault.

H.J., she was naked and unconscious. H.J. falsely named a friend as the father of the child. Monica helped H.J. get an abortion on February 15, 2020.

Several weeks later, H.J. found Jackson and Monica asleep together in Monica's bed. H.J. attacked Jackson and screamed at him. H.J. told Monica that Jackson had been sexually assaulting her and that he was the father of the child she had aborted. H.J. then moved out to live with her sister, C.J.

After this, Jackson spoke with Monica and attempted to make excuses for H.J.'s behavior. Jackson told Monica that "it's not what you think[;] it didn't happen the way you think it happened." Jackson told Monica that "[He] didn't do anything wrong [and] that [H.J.] forced him." After this conversation, Monica discovered explicit messages exchanged between Jackson and H.J. on the Snapchat app. Monica allowed Jackson to continue living with her, and Monica tried to persuade H.J. to return home despite Jackson still living there. H.J. reported the abuse to Detective Susan Cantrell at the Department of Social Services.

Pre-trial Proceedings

On July 19, 2021, Jackson was indicted, and on August 11, 2021, the court appointed a public defender to represent Jackson. Through a motion filed by Jackson on August 17, 2021, he claimed he was unsatisfied with the public defender, and in response, the trial court appointed Thaddeus Furlong as Jackson's second attorney. Jackson's case was set for trial on March 10, 2022. On March 3, 2022, Furlong moved to withdraw because Jackson was no longer cooperating. The trial court granted Furlong's motion to withdraw as counsel on May 13, 2022, and appointed John Spencer as Jackson's third attorney. On May 23, 2022, given a conflict of interest, the trial court appointed Tara-Beth Coleman as Jackson's fourth attorney, relieving Spencer. Jackson's case was set for a jury trial on November 15, 2022.

The trial court heard several pretrial motions before commencing Jackson's jury trial. After the case was called, Jackson personally told the trial court that "a friend [was] willing to pay for [him to retain an] attorney." The friend was not present in court. The trial court denied Jackson's motion for new counsel. In making its ruling, the trial court noted that: it had twice appointed new counsel for Jackson due to disagreements; Jackson's latest attorney had represented him since she was appointed in May of 2022; and there was "no evidence that Mr. Jackson [is] able to or . . . really, wants to hire his own attorney."

The trial court granted the Commonwealth's motion, without objection, to amend the dates on the indictments alleging when the crimes had occurred. Jackson requested a bill of particulars to determine whether he had an alibi for the expanded date range of the amended indictments. Jackson's counsel requested a continuance to "explore the alibi defense," but stated that she was prepared to go forward to trial. The trial court denied the motion to continue.

Jackson moved to exclude evidence that Jackson had molested H.J. in locations outside of Spotsylvania County. The trial court denied Jackson's motion. The trial court found that evidence Jackson molested H.J. in locations outside of Spotsylvania County would be relevant because "it would show the relationship between the parties," was "evidence that leads up to the offense intended," was evidence of "absence of mistake," and was evidence of "conduct of [Jackson] toward the victim." The trial court ruled that the evidence was probative, as it involved the same perpetrator and the same victim as the events for which Jackson was on trial.

The Commonwealth moved to exclude testimony that H.J. had conspired with a friend to kill Monica. The trial court granted this motion in part but ruled that it would allow cross-examination touching "on [H.J.'s] attitude or behavior toward [Jackson]." During the trial, the court did in fact allow Jackson to cross-examine Monica as to whether H.J. had ever plotted against her.

<u>Proceedings during Trial</u>

After the Commonwealth rested, Jackson moved to strike. Jackson argued that H.J.'s testimony was contradictory. The trial court denied the motion, ruling the evidence was sufficient to create a jury issue.

Detective Cantrell testified as a defense witness, and Jackson, through counsel, introduced an interview at the Child Advocacy Center into evidence. Jackson's attorney did not ask for the interview to be published to the jury at that time, but stated that she "thought the jury would like to see [the interview] during deliberations."

Jackson testified in his own defense. Jackson denied that he ever drove H.J. to Charlottesville without his son being present and denied that he and H.J. pulled over to the side of the road. Jackson testified that he slept downstairs, with Monica, "to avoid [H.J.]." Describing the encounter where Monica had found Jackson holding H.J. while she was naked and wrapped in a blanket, Jackson claimed that he had awoken to find H.J. next to him and that he thought that it was H.J.'s younger brother.

Jackson denied ever having had sexual intercourse with H.J. Jackson testified that instead H.J. exploited him while he was asleep. Jackson alleged that when he threatened to tell Monica about the exploitation, H.J. replied that she would say Jackson had raped her.

After the defense rested, Jackson renewed his "earlier motion . . . for the same reasons." The trial court did not rule on the motion and proceeded to hear rebuttal evidence from the Commonwealth. Jackson did not make or argue a motion to strike after the Commonwealth rested its rebuttal case.

<u>Post-trial Motions</u>

On June 28, 2023, the trial court heard Jackson's motions to set aside the verdict[2] and his attorney's motion to withdraw as Jackson's counsel. After considering the briefs and hearing argument, the trial court denied the motions to set aside the verdict.[3]

After the trial court denied Jackson's motions, Jackson's attorney moved to withdraw as his counsel. Jackson expressed his desire to represent himself, and the trial court conducted a colloquy with Jackson to determine whether he understood his request and was competent to proceed *pro se*. The trial court found that Jackson had "knowingly, intelligently, and voluntarily waived his right to be represented by counsel" and allowed Jackson to proceed *pro se*.

The trial court then continued the case for sentencing. Prior to the hearing, Jackson filed a new motion to set aside the verdict. On August 7, 2023, the trial court heard Jackson's motion to set aside the verdict and conducted the sentencing hearing. After hearing argument, the court denied Jackson's motion to set aside the verdict. The trial court sentenced Jackson to 40 years of incarceration with 25 years suspended.

## ANALYSIS

I. Jackson's first, fourth, and fifth assignments of error are procedurally defaulted.

Jackson made no argument referring to the first assignment of error in his brief. Rule 5A:20(e) ("With respect to each assignment of error, the standard of review and the argument—including principles of law and the authorities—must be stated in one place and not scattered through the brief. At the option of counsel, the argument may be preceded by a short summary.").

---

[2] Although represented by counsel at the time, Jackson filed a separate motion on his own behalf to set aside the verdict. His attorney adopted and presented that motion at the hearing.

[3] According to the transcript, the trial judge stated that "[t]he jury improperly considered all the evidence and rendered a verdict." Viewed in context, this appears to be either a mistake in the transcript or a misstatement of the trial court.

"The Supreme Court concluded that 'when a party's "failure to strictly adhere to the requirements of Rule 5A:20(e)" is significant, "the Court of Appeals may . . . treat a question presented as waived."'" *Atkins v. Commonwealth*, 57 Va. App. 2, 20 (2010) (alteration in original) (quoting *Parks v. Parks*, 52 Va. App. 663, 664 (2008)). Jackson's first assignment of error asserts that the trial court erred by denying a continuance. The bulk of the accompanying argument section of his brief, however, contends that the trial court erred by denying his request for a bill of particulars.

In Jackson's fourth assignment of error, he asserts that the trial court erred when it played Jackson's Exhibits 1 and 2 when Jackson was not present. The argument in Jackson's opening brief focuses specifically on the issue of a video exhibit that the jury may have viewed for the first time during deliberations, outside of Jackson's presence. That argument is not preserved. Jackson, through counsel, invited whatever alleged error occurred. Jackson offered the video and audio exhibits at trial as part of his case. At the time he admitted those exhibits into evidence, Jackson chose not to play them then for the jury, and counsel told the court, "I thought the jury would like to see that during deliberations." After trial, Jackson, while still represented by counsel, filed a *pro se* motion to set aside the verdict, asserting erroneously that the Commonwealth had introduced the evidence outside of his presence in violation of his constitutional rights. At the hearing, he asserted that the Commonwealth and his attorney had conspired to violate his rights by letting the jury view evidence he had not seen. The trial court denied his motion. Jackson does not invoke any of the exceptions to the waiver rules on appeal, thus this whole issue is not preserved for appellate review.

Jackson's fifth assignment of error is also waived. Jackson alleges that the "court erred in its ruling to allow the defense to impeach a witness . . . based on her crime of moral turpitude in conspiring with another to murder her friend's parents in return . . . for the other person's agreement to murder her parents." First, the record cites in the assignment of error point to a portion in the record where the court took the motion under advisement, not when the court made a definitive

ruling.  Second, the court did not prohibit Jackson from attempting to impeach the victim's credibility; instead the court ruled that it would allow the defendant to impeach the victim on cross-examination if the questions "would touch on her attitude or behavior toward [Jackson]."  Thus, the assignment of error is waived as it misconstrues the court's ruling.  *See Rawls v. Commonwealth*, 272 Va. 334, 344 (2006) (finding that appellant's assignment of error did "not relate to the procedural determinations of the trial court and the Court of Appeals," thus the Court determined that it would not consider the merits of that assignment of error); Rule 5A:20(c).

II.  The trial court did not err when it denied Jackson's continuance request.

Jackson asserts that the trial court erred when it denied his continuance request to allow Jackson time to hire an attorney.

"A party challenging a circuit court's denial of a motion for a continuance must demonstrate both an 'abuse of discretion' and resulting prejudice[.]'"  *Bailey v. Commonwealth*, 73 Va. App. 250, 265 (2021) (alteration in original) (emphasis omitted) (quoting *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34 (2007)).  "Only when reasonable jurists could not differ can [this Court] say an abuse of discretion has occurred."  *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).  "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance."  *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

"[C]ourts are accorded wide discretion in deciding whether to grant continuances to enable a defendant to secure new counsel."  *McNair v. Commonwealth*, 37 Va. App. 687, 697 (2002) (en banc).  This Court reviews de novo whether a defendant's Sixth Amendment right to counsel was violated.  *Walker v. Commonwealth*, 71 Va. App. 665, 672 (2020).

Court-appointed counsel represented Jackson at trial, however, Jackson argues that he should have been allowed time to hire a different attorney. Jackson contends that he informed the trial court that he had the money to hire an attorney of his own choosing and that the court's denial was contrary to law. The argument on brief accompanying Jackson's assignment of error asserts merely that the trial court's denial of a continuance to allow Jackson to hire his own attorney was "against black letter law and case law," with a footnote listing cases explaining a defendant has the right to counsel.

Jackson was, however, not entitled to a continuance to retain new counsel. The right to counsel is qualified and limited by state interests. *Reyes v. Commonwealth*, 68 Va. App. 379, 386 (2018). Furthermore, exceptional circumstances must exist for a defendant to justify a last-minute change in counsel. *Feigley v. Commonwealth*, 16 Va. App. 717, 721 (1993). And the right to effective assistance of counsel does not necessarily mean that the defendant gets to choose a particular attorney. *Hummel v. Commonwealth*, 219 Va. 252, 258 (1978), *cert. denied*, 440 U.S. 935 (1979). The right also does not ensure that a client will necessarily have a meaningful relationship with his or her attorney. *Morris v. Slappy*, 461 U.S. 1, 14 (1983).

Similar to this case, the defendant in *Feigley* waited until the day of his trial to request a continuance. *Feigley*, 16 Va. App. at 721. Like Jackson, Feigley also informed the trial court that he was suddenly able to retain his own attorney. *Id.* Feigley's trial date was more than six months after his first attorney had been appointed and was three months after his second attorney was appointed. *Id.* In that case, the record contained no indication that his attorney conducted an inadequate investigation, was unprepared for trial, or failed to pursue a vigorous defense. *Id.* Feigley's only stated basis for requesting a continuance was that he believed that a retained attorney would be better than his court-appointed attorney. *Id.* The Court upheld the trial court's denial of Feigley's motion, noting that Feigley's continuance motion was untimely. *Id.* at 722.

Here, Jackson waited until the day of trial to request a continuance in order to obtain new counsel. The record reflects that Jackson's basis for requesting a new attorney was vague and lacked any argument that his court-appointed attorney had failed to properly represent him. Jackson had court-appointed counsel for over a year prior to his trial date and his attorney at trial had represented him for over five months prior to his trial. There were no claims that Jackson's attorney failed to vigorously defend him or that the attorney was unprepared for trial. In fact, Jackson's counsel stated on the record that she was prepared to go forward to trial.

Thus, Jackson's motion for a continuance was improper and the trial court was not plainly wrong in denying that same motion.

### III. The trial court committed no error when it admitted evidence that Jackson molested H.J. outside of Spotsylvania County.

Jackson challenges the trial court's denial of his motion to exclude evidence of similar illegal acts he committed outside of Spotsylvania County. Jackson argues that evidence of sexual contact with H.J. in locations outside of Spotsylvania County is "clearly more prejudicial than probative."

"It is well-settled that '[d]ecisions regarding the admissibility of evidence "lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion."'" *Nottingham*, 73 Va. App. at 231 (alteration in original) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). "Evidence of other crimes, wrongs, or acts is inadmissible if offered *merely* to show the accused's propensity to commit the crime for which he is charged." *Conley v. Commonwealth*, 74 Va. App. 658, 670 (2022) (emphasis added); *see* Va. R. Evid. 2:404(b); *Kenner v. Commonwealth*, 299 Va. 414, 424 (2021); *Gonzales v. Commonwealth*, 45 Va. App. 375, 380 (2005) (en banc).

Evidence of prior bad acts is admissible "if it tends to prove any relevant fact pertaining to the offense charged, such as where it is relevant to show motive, opportunity, intent, preparation,

plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plan." Va. R. Evid. 2:404(b). Evidence of prior bad acts is admissible "when it 'shows the conduct or attitude of the accused toward his victim[,] establishes the relationship between the parties,'" *Kenner*, 299 Va. at 424 (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008)), or if "the evidence is connected with or leads up to the offense for which the accused is on trial," *Woodfin v. Commonwealth*, 236 Va. 89, 95 (1988) (quoting *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970)). Particularly relevant here, in a prosecution for incest, evidence of prior recent "acts of incestuous intercourse between the parties other than those charged in the indictment" is admissible to show "the relations of the parties and the incestuous disposition of the defendant toward the other party, and to corroborate the proof of the act relied upon for conviction . . . ." *Moore v. Commonwealth*, 222 Va. 72, 77 (1981) (alteration in original) (quoting *Brown v. Commonwealth*, 208 Va. 512, 516-17 (1968)).

The trial court must still determine whether the risk of unfair prejudice outweighs the probative value of the evidence. *See* Va. R. Evid. 2:404(b). "[A]ll probative direct evidence generally has a prejudicial effect to the opposing party." *Lee v. Spoden*, 290 Va. 235, 251 (2015) (citing *Powell v. Commonwealth*, 267 Va. 107, 141 (2004)). "'[U]nfair prejudice' refers to the tendency of some proof to inflame the passions of the trier of fact, or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Id.* at 251.

The facts in *Conley*, 74 Va. App. 658, are directly on point. In *Conley*, Conley was charged with sexual offenses against his victim in Albemarle County. *Id.* at 668. On appeal, Conley alleged that the trial court erred when it admitted evidence that he committed identical sexual offenses against the same victim when the two lived in Fairfax. *Id.* at 671. In concluding that the probative value of the evidence was not substantially outweighed by its prejudicial effect, the Court found that the Fairfax acts were relevant and admissible because they showed "the relationship between the

- 11 -

parties and . . . Conley's conduct and attitude toward [the victim.]" *Id.* at 672. The Court explained that the evidence also "demonstrate[d] an idiosyncratic pattern of behavior toward [the victim]" that "evince[d] Conley's intent to sexually assault [the victim]." *Id.* The Court concluded the evidence was unlikely to have inflamed the jury's passions because the acts in Fairfax were indistinguishable from the acts committed in Albemarle County. *Id.* at 673.

Here, Jackson's molestation of H.J. outside of Spotsylvania County was substantially the same as his assault of H.J. within Spotsylvania County. When H.J. was 12 years old, Jackson drove H.J. to see her brother in Charlottesville but pulled the car over and moved H.J.'s head onto his penis and held it there while he masturbated. In Virginia Beach, Jackson took H.J. into a bedroom and told her that "[she] want[ed] it," took off his clothes, and then took off H.J.'s clothes. H.J. told Jackson to "stop," but Jackson "had sex" with her. Similarly, Jackson had sex with H.J. at least "eight or nine" times at their house in Spotsylvania County. Those assaults occurred in H.J.'s room, in her sister's room, and in the living room of the house. Jackson's assaults in and outside of Spotsylvania County were all of the same type and against the same victim. Jackson does not argue that the passions of the jury were inflamed by the prior bad acts; instead he simply argues that the evidence was "clearly more prejudicial than probative." Jackson fails to state why. The trial court, reasoning its decision, stated that:

> [W]hat's been proffered is clear to the Court that it is relevant in that
> it would show the relationship between the parties, evidence that
> leads up to the offense intended, the accused absence of mistake, if
> that's what's claimed or in the conduct of the of the accused toward
> the victim. And given that, it involves the same victim in the case
> and everything else has been argued. The probative value of the
> evidence would outweigh any, any prejudice that may result from
> that. Of course, the jury will be instructed that it's not propensity,
> it's not offered for those other reasons, just to say that he acted in
> conformity with that, but it will be admissible for those other
> purposes.

- 12 -

The trial court analyzed whether the risk of unfair prejudice outweighed the probative value of the evidence and found that the evidence tended to prove relevant facts relating to the offense charged. The trial court did not abuse its discretion in reaching this conclusion. Thus, the trial court's ruling that the evidence of prior bad acts outside of Spotsylvania County could be admitted is affirmed.

CONCLUSION

For these reasons, we affirm Jackson's convictions.

*Affirmed.*